WILLIAM E. CANNELL, Plaintiff-Appellee, *v.* STATE FARM FIRE & CASUALTY Co., Defendant-Appellant.

(No. 73-243;

Second District (1st Division)—February 14, 1975.

Keegan & Gosdick, of Rockford, for appellant.

Cook & Hellyer, of Loves Park, for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff recovered a judgment on a jury verdict in the amount of $4,760.70 for damage to corn crops alleged to have occurred as the result of a hailstorm within the policy of insurance issued by defendant. Defendant appeals, claiming that the verdict was contrary to the manifest weight of the evidence and that the damage award was not based on the evidence.

A policy of crop hail insurance covered plots of 122 acres, 80 acres and 53 acres, respectively. Plaintiff planted corn on the three plots in the latter part of April and through the first week in May of 1971. Four well-known hybrid seeds were used, and the land was properly fertilized with nitrogen, phosphorous and potash. A severe hailstorm struck plaintiff's farm as well as other areas in the vicinity on June 1, 1971. On June 2 or 3, defendant's agents examined the 122-acre field and concluded that the corn was in the three-leaf stage and that it was too early to determine damage. On June 24, 1971, defendant's agents examined a 15-acre area on the 53-acre plot and determined that there was a 7% loss. Plaintiff signed an agreement accepting $105 for the loss. The agreement had indicated that there was no loss on the other acreage, but plaintiff testified that this was not discussed and that he did not read the agreement.

Plaintiff testified that after he had picked 68 acres from the 122-acre plot he noticed something wrong. He said that the yield was not bad at first when he was getting about 60 bushels to an acre, but that it diminished to 30 bushels and less in other parts of the plot. He notified defendant, who sent agents who looked over the field and then returned with Dr. Rodney Fink, professor of Agronomy at Western Illinois University, who conducted a further examination. Dr. Fink concluded that there was no evidence of crop damage due to hail, and defendant refused further compensation.

At trial the plaintiff offered the testimony of the superintendent of a golf course located several blocks away from portions of plaintiff's farms, who described the hailstorm as "devastating." Photographs of the hail and very heavy damage to the golf course were admitted into evidence and depicted hail almost the size of golf balls.

The plaintiff, who had been a farmer for all but 5 of his 66 years, testified that he observed his farms after the storm and noted that everything was "chewed up," that leaves were off trees and plants and that there were main breaks in the stems and the main stems of the leaves. There was testimony that at the time of the storm the crop on the 122-acre plot was approximately 4 weeks old and about 8-12 inches high in most parts and not less than 6 inches in a few other parts. On the 53 acres the crop was about the same height. And on the 80 acres, which had been planted last, the corn was up about 3 or 4 inches at the time of the storm. During the process of cultivating, plaintiff observed differences in the appearance of the corn in the different areas. He testified that he observed that corn on the 122-acre plot had not developed properly. Stalks had grown properly but did not get ears on them, only little nubs which did not develop into ears. He noticed a difference in yield between the 122-acre plot and the others. Ordinarily the average yield on the 53-acre plot should have been lower than on the 122-acre plot, but it was greater. There was testimony that the 122-acre plot (rated as 103 acres) had been classified by SAC of the Department of Agriculture as a 95-bushel-per-acre area while the 53 acres was rated as a 76-bushel-per-acre area.

Plaintiff testified that since the 53 acres and the 122 acres had been planted consecutively and with the same varieties of seed, and since the corn on both was about the same height when the hail struck, he ruled out farming error as the cause of the defective yield on the 122-acre plot. He noted that it was a good growing season and that there had been sufficient rainfall. He concluded, based on the weather conditions that year and his own observations, that the hailstorm of June 1, 1971, caused the defective growth, since he had eliminated everything else he could think of.

Russell Gayton, a neighboring farmer, testified that he saw plaintiff's crop about 6 or 8 weeks after the hailstorm and observed that it was full grown but peculiar. He said that some stalks were struggling to make an ear and that some had two or three little ears coming out of the same shank on the stalk. Although he did not testify as to the cause of the defective growth, he appeared to rule out poor fertilization, blight or insects as causes based on his observations. He also testified that as to weather and heat stress, it was a fairly normal year and that there had been a good yield generally through the area that year.

Another neighboring farmer, Edward Strathman, testified that he was raising a corn crop near plaintiff's farm which was also about 8 or 9 inches high when the hailstorm hit. He testified that there was extreme stripping of leaves and indentations in the ground with pot marks as

much as 2 inches deep affecting the crops on his farm. He testified that the corn on his farm was planted with similar seed, fertilized in a similar fashion and grown on similar land as that of the plaintiff. At harvest time, the portion of his farm damaged by hail yielded approximately 30 bushels per acre less than the rest of his crop. He noted blank stalks without an ear and some with grotesque defective ears, giving a sort of three-finger appearance, similar to that observed on plaintiff's farm. He also testified that there had been no real heat stress and that it had been a very good growing season as to heat and rainfall. Accordingly, it was his conclusion based on his many years of farming experience and the consideration of other matters which affect the growing of corn that the ears of corn on the affected portion of his farm land did not properly develop because of the hailstorm.

An agent for the defendant testified that he visited plaintiff's farm immediately following the hailstorm and observed that the corn was then in the three-leaf stage of growth development. On cross-examination, a University of Iowa work was referred to in which it was stated that after 2 weeks of growth corn is generally at the four-leaf stage and after 3 weeks of growth, the six-leaf stage. The cross-examination was in reference to the plaintiff's testimony that his corn had been growing for 4 or 5 weeks when it was examined.

The crop-hail supervisor for the defendant testified that he visited plaintiff's farm during the harvest and observed that the field of corn was poor with numerous small ears that were not filled out. It was his opinion that observable defects in the corn were possibly the result of weather conditions, but not hail. He further testified that until the corn plant is 18 inches in height, the growing point of the corn is below the ground. On the assumption that plaintiff's corn at the time of the hailstorm was only in the three-leaf stage, he testified that the hail could not have been the cause of the defective condition noted at the harvest since hail would have no effect on corn at the three- or 4-leaf stage of development.

Dr. Fink, shown to be a well-qualified expert, testified that in October of 1971 he spent several hours examining the 122-acre plot and concluded that there was no indication of hail damage or bruises on the matured corn crop, part of which had been picked, although he conceded that bruising was difficult to detect at any point. He observed that the corn did not develop and concluded that no pollination had taken place or that it had aborted. He examined the soil and testified that it was a sandy loam with low moisture holding capacity which could have caused as much as a 50% decrease in yield.

He testified that hail would not affect corn plants in less than a six-

leaf stage because the growing point is below the ground prior to that time and that after 5 or 6 weeks of growth, corn is only between the two and five-leaf stage. He gave his opinion that the hail did not account for the damage found on the 122-acre plot. He said:

> "A. My conclusion is based on that there was no visual indication of hail damage. There was no defoliation. The stand was still adequate on the field and if there was any reduction it couldn't have been a reduction due to the hail on that particular field, although, I guess it's always possible. There was no injury from hail."

In rebuttal for the plaintiff, Wallace Reynolds, an employee of the Boone County Extension Service and a graduate in general agriculture from the University of Illinois, testified that an ear of corn will take form at about the eight-leaf stage after approximately 25-45 days of growth and that damage from hail could result at the six-leaf stage when the corn is 15-18 inches in height. He also testified that when corn is 4 weeks old hail will provide a shock to the plant and, accordingly, the plant will not produce as efficiently as it possibly could have if there had been no stress or shock.

Further rebuttal testimony was offered to contradict Dr. Fink's testimony that the ear and tassel of the corn could not be found inside the stalk until at least the six-leaf stage of growth. A neighboring farmer testified that by cutting the corn plant with a razor blade as it emerges from the ground one would find the ear and tassel therein. He stated that hail striking any one of those tender areas, which he described as being similar to an embryo, would cause injury.

Defendant contends that the expert testimony of Dr. Fink to the effect that hail could not have produced the condition found on the 122-acre plot has not been contradicted either by positive testimony or circumstances. It argues that the contrary conclusion reached by the plaintiff was unscientific and not based on the evidence but on the premise that he could not ascribe the crop damage to anything other than the hail. Defendant further argues that none of plaintiff's other witnesses established hail as a probable cause of the damage; one of the neighboring farmers who testified for the plaintiff merely stated that he had never seen anything like the condition he saw and concluded he did not know what produced it, while another, whose farm was 6 miles from Cannell's, had not made an inspection of the Cannell farms, did not see any ears of corn from them and was testifying to a different set of circumstances on his own property.

■■ To prove a cause of action within the terms of the policy issued by defendant, it was essential for the plaintiff to prove that the hailstorm of

June 1, 1971, was the cause of the damage to the corn crops. We approach this issue, keeping in mind the rule that if a verdict is based on evidence we may not reverse it unless it is against the manifest weight of the evidence. For a verdict to be against the manifest weight of the evidence, it must be clearly and palpably against the weight of the evidence (*Union Drainage District v. No. 1 v. Special Drainage District* (1973), 10 Ill.App.3d 829, 835), or an opposite conclusion must be clearly evident (*Karris v. Woodstock, Inc.* (1974), 19 Ill.App.3d 1, 11-12; *Rhodes v. Oliva* (1973), 13 Ill.App.3d 849, 855-856).

The plaintiff, an experienced farmer, was permitted, without objection to his competency, to state his opinion that the hail caused the defective growth. A neighboring farmer of long experience, Russell Gayton, stated his opinion which ruled out fertilizers, heat stress, blight or insects as potential causes of damage, although he was unable to give his affirmative opinion that the damage was caused by hail. Farmer Strathman, who cultivated farms some miles away from plaintiff's land, testified to crop damage on his own farm, which had similar and relevant growing conditions to that of plaintiff's farm, and stated that, in his opinion, the cause of a 30% decrease in his corn crop was due to the hailstorm of June 1, 1971. If credible, the inference which the jury was permitted to draw from this opinion testimony was that if the hailstorm caused damage to Strathman's farm, then it had probably been responsible for similar damage caused to plaintiff's farm. Plaintiff also offered proof through the manager of a neighboring golf course that the storm was severe enough to damage the course extensively. Additionally, plaintiff offered the testimony of an agricultural expert who partially contradicted the premises relied upon by defendant's experts.

■■ The opinion of an expert is permitted on the basis that the witness has peculiar knowledge or experience not common to the world which renders his opinion based on such knowledge and experience an aid to the trier of facts in deciding the case. (*Merchants National Bank v. Elgin J. & E. Ry. Co.* (1971), 49 Ill.2d 118, 121.) The testimony of experts must be judged by the same rules of weight and credibility which are applied to other witnesses, and the weight and value of the testimony largely depends on the foundations of fact and reason upon which the opinions stand. *Peet v. Dolese & Shepard Co.* (1963), 41 Ill.App.2d 358, 369; *People v. Burress* (1971), 1 Ill.App.3d 17, 20; *Lombard Park District v. Chicago Title & Trust Co.* (1969), 105 Ill.App.2d 371, 375.

The knowledge required to qualify one as an expert may be obtained from study, experience or both (*Norfolk & W. Ry. Co. v. Anderson* (1966), 207 Va. 567, 151 S.E.2d 628, 631; *Manhattan Oil Co. v. Mosby* (8th Cir. 1934), 72 F.2d 840, 844-5), and farmers may be said to have

peculiar knowledge of their particular calling in this regard. See 31 Am. Jur. 2d *Expert and Opinion Evidence* § 168, at 730 (1967); Rogers, The Law of Expert Testimony § 276, at 640 (3rd ed. 1940).

■■ The witness whose knowledge is based on practical experience and the one who possesses particular academic or scientific knowledge are in the same general category as expert witnesses, and their respective effect on the triers of fact is one of degree only. (*Dauksch v. Chamness* (1973), 11 Ill.App.3d 346, 352.) There is insufficient basis for distinction between them, and accordingly, it is for the jury to determine the weight to be given to their testimony. *Arnold v. Carpenter* (1967), 83 Ill.App.2d 343, 346.

■■ In the present case there is a substantial quantity of conflicting testimony and contradictory evidence. Although the defendant's position finds substantial support in the record, we are unable to conclude that a verdict in its favor is clearly evident. Moreover, we cannot say that the plaintiff's testimony and the evidence presented on his behalf lacks a factual basis. Compare *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill.App.3d 165.

The jury has heard the evidence and observed the demeanor of the witnesses as well as their manner of testifying. Accordingly, in a situation where reasonable men could arrive at different results, we conclude that the jury was in the best position to determine the truth of the matter in controversy. In the absence of a showing that the jury's verdict in this case was palpably erroneous, we hold that it must stand.

Defendant next contends that the money award was not based on the evidence and that the amount determined by the jury cannot be explained in any rational manner.

The plaintiff's damage claim was based primarily on the damage to the 122-acre plot. His claim for damages on that plot was in the amount of $6,710, which represented a 55% claim loss on 122 acres at the $100-per-acre figure set in the insurance policy. He based this 55% estimate on the decreased yield at harvest which he noted during the combining process by visual observation and by the fact that the first 60 acres of the 122 which he had picked yielded on the average of 51 bushels per acre as it came off the scales. He testified that the yield was far below the 95-bushel-per-acre rating by the SAC of the Department of Agriculture.

Plaintiff's estimate of the damage on the remainder of the 122 acres was not as precise. He said that it yielded in the "neighborhood" of 51 bushels per acre. However, it appeared from his testimony that after picking the first 60 acres of the 122 he had begun to pick from the 53-and the 80-acre plots and mixed the yield from these plots with the

remaining acreage of 122 so that the precise weights of each could not be determined.

■■ The amount of damages is ordinarily to be left to the jury, and we may not upset their award unless it appears motivated by passion or prejudice. (*Larson v. Thomashow* (1974), 17 Ill.App.3d 208, 218; *Bloomfield v. Retail Credit Co.* (1973), 14 Ill.App.3d 158, 170.) Although it is true that damages are not recoverable without some evidence as to amount (*Stein v. Green* (1955), 6 Ill.2d 234, 240; *Falejczyk v. Meo* (1961), 31 Ill.App.2d 372, 377), it is also true that where damages are not susceptible of exact computation they may be determined from the testimony of witnesses and opinions expressed by them, and such a judgment need not be reversed unless clearly the result of passion or prejudice. *Collins v. Sanitary District* (1915), 270 Ill. 108, 116; *Goldstein v. Hertz Corp.* (1973), 16 Ill.App.3d 89, 98.

■■ The jury verdict was $4,760.70.[1] This figure is reasonably within the range of the evidence, and we find nothing in the record to indicate that the amount was determined as a result of passion or prejudice. We, therefore, affirm the judgment below.

Affirmed.

GUILD and HALLETT, JJ., concur.

---

[1] While there is no way to arithmetically prove the method of computation used by the jury, it is reasonably possible that they considered that the first 60 acres picked averaged approximately 51 bushels per acre, which was 44 bushels per acre less than the 95 SAC rating. Applying a 44/95 percentage against the $6,000 ($100 per acre) which would have been the total amount recoverable if there had been a complete loss on the 60 acres, the jury could have reached a figure of approximately $2,800 for the first 60 acres. It is possible that as to the balance of the 122 acres, which the plaintiff was not able to assess with precision, the jury may have considered the 30% loss of crop, to which the witness Strathman testified, rather than accepting plaintiff's estimate of a higher loss. On 62 acres (30% of $6,200), the amount of loss would be $1,860. Adding the damage on the 60-acre plot to the estimated damage on the remaining 62 acres, the jury could arrive at a figure very close to the $4,760.70 which they reached.