THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALMA WALTON *et al.*, Defendants-Appellants.

First District (1st Division)    Nos. 79-1055, 79-1081 cons.

Opinion filed March 30, 1981.

Kenneth L. Jones, of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

This appeal arises out of a food stamp investigation in the Illinois Department of Public Aid (hereinafter Department) wherein co-defendants Alma Walton and Cora Sowell, employees of the Department, were indicted on a total of 48 counts of theft and official misconduct pertaining to the unauthorized or deceptive control of authorizations to purchase food stamp cards which they allegedly used to illegally obtain food stamps. Walton was convicted on 34 counts of theft and official misconduct after a jury trial, and Sowell was convicted on 18 counts of theft and official misconduct after a bench trial held in conjunction with Walton's trial.

On appeal, the defendants argue that they were not found guilty of the aforesaid offenses beyond a reasonable doubt. Additionally, Sowell

argues that her two-year sentence was excessive where she had no prior criminal record and was the custodial parent of a young child. Walton also argues that she was erroneously convicted and sentenced on multiple counts based on the same act. We affirm in part, reverse in part, and remand for resentencing.

While the trial of the instant cause produced a voluminous six-volume record and the State has presented 38 pages of facts in its brief, our review of the facts will be limited to those facts necessary to a discussion of the issues. During the September 1975 to June 1976 period in which the alleged illegal acts occurred both defendants were assigned to the South Suburban office of the Department. Defendant Walton was the head financial clerk and defendant Sowell a food-stamp control clerk under Walton's supervision. The South Suburban office consisted of a main office and a satellite office located approximately one block away. The satellite office housed the food-stamp disbursement operation until March 1976, at which time it was moved to the main office. Prior to this move, Sowell worked at the satellite office and Walton worked at the main office.

The office procedure used in regard to the disbursement of food stamps was outlined through the testimony of a number of the staff of these two offices. According to their testimony an individual comes to the office and makes an appointment to interview with an intake caseworker. At that interview the caseworker determines eligibility for food stamps, the amount the recipient must pay for the stamps, the number of cards he is entitled to, and the expiration date of his food stamps. In a "zero purchase" situation the food stamps would be provided to a recipient free of charge. If eligibility is found, the caseworker prepares an authorization form for food stamps. After the file is reviewed by the supervising caseworker, it is turned over to the food stamp control clerk in the financial department. This clerk transfers the information from the authorization form to a ledger and assigns one or more authorizations to purchase cards (hereinafter ATP cards) to the file. This card is redeemed by the recipient at a currency exchange to obtain his food stamps. The ledger entry lists the ATP cards by serial number in consecutive order and lists the name and address of the recipient, amount of stamps issued per card, the number of cards issued to the recipient, case number, category of aid and the name of the caseworker who authorized the stamps. After posting to the ledger, the control clerk attaches the assigned ATP card(s) to the recipient's authorization form and gives it to a typist, who types information from the authorization form onto the ATP card. After the typist finishes typing a number of these cards, the typist returns the authorization form and ATP card to the food stamp control clerk, who

checks the card for errors. If no errors are discovered, the ATP card is mailed to the recipient or given to a waiting recipient. One copy of the authorization form is stored with the ledger, and one copy is returned to the case file. Any voided ATP card is also attached to the ledger. According to Powell, as office manager, he spot-checked the ledgers to insure that all the authorization forms were attached before they were put into storage.

There was extensive testimony during the trial concerning access to the files, the ledger, and the ATP cards as access to these were necessary for the perpetration of the alleged offenses. Powell testified that generally only the file department had access to the case files but that the caseworkers also had access when there was a shortage of file clerks. However, other staff members acknowledged that virtually every person in the office had access to the case files and there was no prohibition against any person going to the file cabinets where the clients' records were stored. Powell also explained in this regard that, as the main office opened at 8 a.m. and as he didn't arrive until 8:30, anyone could have access to the files during that period. Testimony further revealed that, while under the official office procedure outlined by the ex-district supervisor and the office manager, only Sowell, Walton or someone specifically designated by Walton would make entries on the ledger. In fact, Diane Jusk, supervising caseworker at the satellite office, and at least one typist would also make ledger entries on occasion. Jusk also testified that it would take as much as five days from the time the food stamps were authorized until the authorization document reached Sowell's desk.

General responsibility for the ATP cards rested with the office manager Jesse Powell. He ordered the ATP cards from Springfield by written request and received them by United Parcel. Upon receiving a new packet of ATP cards, he verified that he received his full order by checking the first and last number of the serial numbers on the cards and then stored the ATP cards in a safe in his office that he kept solely for that purpose. Annie Robinson, ex-district supervisor, testified that she thought that Walton knew the combination to this safe although Walton denied such knowledge. Five or six hundred ATP cards were kept on hand at all times, and over 7,000 cards were ordered during the period of time in issue. The ATP cards were signed out by Sowell as food-stamp control clerk, Walton as head financial control clerk, Diane Jusk as the supervising caseworker at the satellite office and anyone else designated to disburse the cards by Walton. Despite the apparent concern over the safekeeping of the cards, Jusk testified that ATP cards were left unattended on the typists' desks at various times during the day, a fact verified by two typists. Rusk also testified that Walton was not at the satellite office on a regular basis. It was also noted that at one time the ATP cards

were out of sequence and on another some were missing for a period of time. None, however, were ever reported stolen, nor was there a burglary of the premises during this time period.

The investigation out of which the prosecution of this case arose was primarily conducted by Earnest Hines, an investigator with the Bureau of Special Investigations for the Department. The investigation began, according to Hines' testimony, when Howard Walton, the defendant's ex-husband, went to Hines and gave him a photocopy of a document. Based on information which he received from that document Hines checked the ledger entries for four ATP card serial numbers and then compared these to the redeemed ATP cards which he obtained from Springfield. This revealed an inconsistency for each card between the name on the ledger and the name listed on the ATP card. Based on this discovery, he went to the South Suburban office and requested the authorization forms for these four entries. None could be produced, although Sowell stated that she had made the entries and at that time there had been authorization forms. After this discovery, Hines had his investigators check with the currency exchanges in the South Suburban district and found that a good number of "zero purchase" ATP cards had been redeemed at these exchanges. When these ATP cards were investigated further inconsistencies were found and again no authorization forms were found. As the investigation proceeded, neither Sowell nor Walton admitted making the ledger entries involved; however, both told Hines that the entries were all made with the necessary authorization forms, although these forms were never found.

After the investigation was underway, Hines received an Adler typewriter from Howard Walton which he claimed had been used by his wife for typing ATP cards. Maureen Casy, a police expert on document examination, verified that the typewriter characters were of the same type found on the ATP cards. While she found insufficient defects in the type to conclusively link the typewriter with the offenses, she did conclude that the dual ribbon used in the typewriter matched the carbon ink used on the ATP cards. Furthermore, when she unrolled the ribbon, she found the contents of eight of the ATP cards on the ribbon in the same sequence in which they appeared on the cards including typing mistakes made and corrected.

Other witnesses at the trial included each of the individuals named as recipients of food stamps on the various ledger sheets for the ATP cards in question. Some had received food stamps before while others had applied for food stamps but for one reason or another had never received them. Each denied having received the stamps as noted on the ledger or of knowing the person named as the recipient on the ATP cards. None had seen the instant ATP cards before. In addition, testimony was

received by most of the individuals actually named on the ATP cards as recipients. Again some had received stamps in the past and others had only applied for them. Some knew defendant Walton but denied having redeemed the food stamps by the use of the ATP card in question. Each with one exception denied that the signature on the redeemed card was their own.

Nellie Ellis testified that she knew defendant Walton, had seen Walton type up the ATP card with Ellis' name on it, had cashed that card and had given Walton $100 for the food stamps she received. Ellis also testified that she had been a friend of defendant Walton and that while at her home she had seen a typewriter similar to the one turned over to Hines by Howard Walton. Her friendship with Walton terminated, Ellis testified, when she discovered from her husband that he was having an affair with Walton.

Several caseworkers who worked at the South Suburban office also testified. One testified that she authorized food stamps near the date one particular ATP card was issued but that she had to reauthorize the stamps for the client because her ATP card never arrived in the mail. Another caseworker testified that while he authorized stamps for two of the individuals named on the ledger, he did so for amounts other than those stated on the ATP card and had not authorized stamps for those named on the ATP cards. A third caseworker also denied authorizing either a card to the individual named on the ledger or to various individuals named on the ATP cards in question although the cards indicated that she was the authorizing caseworker.

Howard Walton's testimony substantiated Hines' testimony concerning the investigation. He testified that on July 14, 1976, he followed his ex-wife as she was on her way to work. At this time he saw her stop her car next to Carl Ellis' car and hand him two envelopes. Howard later saw Ellis redeem the contents of these envelopes for food stamps. Howard also testified that he first saw the typewriter which he subsequently handed over to Hines in February or March, 1975. When he asked his wife about the typewriter she told him that she got it from Carl Ellis. Howard also stated that in January 1975, he, his wife, and Ellis were sitting around the Walton kitchen table discussing Howard's need to have 73 more signatures on a petition in order to get on the Markham, Illinois, aldermanic election ballot. At this time Ellis told him that he could sign the petitions right then and there because he could sign in different handwritings. He demonstrated this talent to the Waltons by duplicating both of their signatures. No signatures were put on the petitions in this fashion, however, Howard stated.

Sowell did not testify in her own defense; however, Walton did

testify. Walton testified that in 1976 she had been head financial clerk at the South Suburban office and that as part of her duties she operated a telecommunication terminal; however, she noted that she had never been employed as a typist at the Department and that the keyboard on the terminal was not comparable to that of a typewriter. Walton stated that if Powell was not in the office, head file clerk Pauline Lailos rather than she took over for him. She stated that she did not know the combination to the safe where the ATP cards were kept. She also stated that she had no duties in regard to the preparation of the ATP ledgers which were Sowell's responsibility. She did not know who replaced Sowell when she was absent from the office prior to March 1976, when Sowell's food stamp operation was moved to the main office. After that date, she did make ledger entries when Sowell was absent but only to provide the typists with some work to do. She never checked the typed ATP's against the ledger on these occasions. She stated that on these occasions she never made a ledger entry without an authorizing document. Moreover, according to her testimony, she never typed an ATP card or caused anyone else to type false information on a card. She also testified that she never owned an Adler typewriter, never used one to fulfill her duties as church clerk, and never discussed a typewriter with her ex-husband. She also denied having given Carl Ellis any envelopes in July 1976 or of having given Nellie Ellis an ATP card. She further denied that a conversation occurred with regard to copying signatures on petitions, and denied having a relationship with Carl Ellis. She stated that her ex-husband had told her that she had not heard the last of him when she signed his name on a title to a car which she traded in.

After the jury found defendant Walton guilty on 34 counts of theft and official misconduct, the trial court found defendant Sowell guilty on 18 counts of theft and official misconduct. Walton was sentenced to a term of from two to six years imprisonment and Sowell to a term of two years. The instant appeals were filed after the defendants' post-trial motions were denied.

ALMA WALTON

Defendant Walton argues that the State's evidence established that she was in a position to have committed the offenses for which she was convicted but that it failed to prove that she rather than her ex-husband Howard Walton, in fact, committed the offenses. She asserts that anything that she knew about the food stamp office procedure was or could have been known by him in that he too had worked for the Department, that he knew Carl Ellis, and that he had used the Adler typewriter. Moreover, she contends that her ex-husband's testimony and role in the investigation was

motivated by his desire to get even with her after their divorce as he had promised.

■■ We do not accept the defendant's interpretation of the State's evidence. The evidence shows that defendant Walton made ledger entries for six ATP cards to two recipients who never received the cards. The cards were in fact issued to Walton's sister-in-law, Jacquiline Webb, her son William Webb, Carl Walker, an alias of Carl Ellis, and Patricia Barr. Barr and the Webbs testified that they never received the cards. Other cards listed on the ledger by Sowell were typed on a typewriter kept by Walton in her home and Nellie Ellis testified that she saw Walton type at least two of the ATP cards on the Adler typewriter. Moreover, the caseworkers which were designated as having authorized the ATP cards denied that they authorized stamps for either the recipient listed on the ledger by Walton or the recipient listed on the ATP card. From these facts and given the jury's role as trier of fact in determining the credibility of the witnesses (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182; *People v. Flores* (1979), 79 Ill. App. 3d 869, 398 N.E.2d 1132), we believe that the jury could conclude that Walton made false entries on the ledger in some instances and in others typed false ATP cards and received some amount of money for her efforts.

Furthermore, the evidence does not support defendant Walton's assertion that Howard Walton knew of the office procedures in regard to food stamp disbursement. The record reveals that Howard Walton worked in the unemployment compensation office of the Department of Labor; he never worked for the Illinois Department of Public Aid. Although he might have been generally aware of the office procedure in regard to food stamp disbursement from his ex-wife, only defendant Walton filled out the ledgers for clients or amounts which caseworkers deny authorizing. Moreover, she had access to the ATP cards, not Howard Walton. Nor do we find that Howard Walton's friendship with Carl Ellis, his gift of money to his ex-wife to buy a coat during a period of time in which he was unemployed, the fact he had used the Adler typewriter to have his niece type a letter to the State's Attorney, or his alleged ill-feelings toward his ex-wife suggest that he committed the offenses rather than she. The State notes in its brief,

> "*Even if* Howard Walton were involved in the typing and negotiation of the cards after defendant Walton made the false entries and took the cards home, this in no way disproves Alma Walton's actions, but instead points to the fact Alma Walton may not have acted alone."

We agree. Even if for the sake of argument the evidence were to support a finding that Howard Walton participated in the falsification of the ATP

cards, this does not negate the evidence in this case which supports Alma Walton's culpability.

■■ Walton next asserts that all of her convictions were based on her allegedly using her position with the Department to alter ATP cards and to use those cards to obtain food stamps. She was convicted of two counts of theft as to some of the ATP cards and two counts of official misconduct as to some cards. She alleges that under the authority of *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, she could not be convicted of two or more offenses arising from the same conduct. As such, she seeks vacation of 10 counts of theft and four counts of official misconduct. The State agrees that this argument is well taken. It disagrees with the defendant, however, that such a step would require this court to remand the cause to the trial court for resentencing based on the fact that the difference in the total number of convictions might have affected the trial court's determination as to the sentences to be imposed. We are not convinced that the total number of convictions may not have influenced the trial court's imposition of Alma Walton's two- to six-year term; consequently, we find it proper to remand the remaining counts to the circuit court for resentencing.

CORA SOWELL

■■ Sowell argues that she was not convicted beyond a reasonable doubt because there was no testimony as to evidence of any wrongdoing on her part and that in fact she was only the scapegoat in a food stamp investigation which revealed loose office procedures where virtually any employee had access to office files and ATP cards and where staff members performed other employees' tasks including typing and making ledger entries. Sowell argues in her brief that at best the State's evidence showed that,

"certain ATP cards, which were later exchanged at a currency exchange for food stamps, did not jibe with certain ledger entries made by Ms. Sowell, and that the authorizing documents for the ledger entries were missing. While, admittedly, this situation would appear to indicate an impropriety on the part of some individual or individuals, it no more establishes Cora Sowell's guilt than it does that of any of the other 206 people who worked in that office and had equal access to the ATP cards."

We find the defendant's argument without merit. While the testimony at trial does in fact present a picture of sloppiness in the office procedures of the South Suburban office and a climate where often responsibility for a particular task was unclear, we agree with the State that this is irrelevant to the question of Sowell's guilt. Sowell admitted making certain ledger entries in the course of her employment and of

assigning specific ATP cards in her possession to each ledger entry. As such, whether various persons could have either legally or illegally procured ATP cards or whether other Department employees made ledger entries becomes totally irrelevant. It was Sowell's responsibility after making a ledger entry to check the accuracy of the typed ATP card against the ledger and then mail the card or cards to the recipient. The record is unrefuted that there were discrepancies between the ledger and the ATP cards in respect to the name of the card's recipient and the face value of the ATP card. Indeed, in four instances, the ATP cards were issued five months before the date set forth on the ledger. This would mean that Sowell could not have had the ATP card in her possession at the time she made the entry. In addition, the record indicates that every recipient named either on the ledger or on the ATP card denied receiving or redeeming the ATP cards except Nellie Ellis. Moreover, some of the ATP cards were typed on defendant Walton's typewriter, an act which could only have been accomplished through Sowell's complicity.

The defendant makes much of the fact that her guilt should not be based solely on the lack of an authorizing document to support her ledger entries. It is argued that it was Powell's responsibility to safeguard the ledger and the authorization documents after the ATP cards were disbursed. However, this argument ignores the testimony of Powell and Walton that it was Sowell's responsibility to keep the ledgers and authorization documents together until they were transferred to a box before ultimately being stored in the basement of the main office. Furthermore, the discrepancies between the ledger entries and the face of the ATP cards could be interpreted as indicating that there were never any authorization documents for these entries. This conclusion is strengthened by the denial of the caseworker, named on the ATP cards, that he authorized for any recipient either the ledger amount or the amount specified on the face of the ATP card. We believe that a review of the evidence, although it was circumstantial, did support the trial court's verdict. *People v. Hayes* (1979), 70 Ill. App. 3d 811, 388 N.E.2d 818; *People v. Johnson* (1975), 32 Ill. App. 3d 36, 355 N.E.2d 144.

The defendant next argues that her sentence of two years is excessive and was motivated by the trial court's desire for uniformity of sentencing for her and her co-defendant. She asserts that the trial court should have granted her probation in light of the fact that she had no prior record, was religious in nature, and was the custodial parent of a young child. Because we believe that we must vacate four counts of theft based on *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, and remand for resentencing on the remaining counts, we need not reach this issue.

Our review of the record reveals that defendant Sowell was indicted and then convicted on two counts of theft for each of four ATP cards.

Under *King*, a defendant may not be convicted for two or more offenses arising out of the same act. In that situation, according to *King*, only the most serious of the offenses may lie. Accordingly, we must vacate four counts of theft. Moreover, we are not convinced that the total number of counts did not have any effect on the trial court and, therefore, must remand this cause to the trial court to resentence in light of the action we have taken.

The judgment of the circuit court of Cook County regarding defendant Sowell is affirmed as to 14 counts of theft and official misconduct but remanded for resentencing of these counts and vacated as to four counts of theft pertaining to ATP cards 901-030-188, 901-226-720, 901-030-817, and 901-506-118. Regarding defendant Walton the judgment of the circuit court of Cook County is affirmed as to 20 counts of theft and official misconduct but remanded for resentencing of these counts and vacated as to 14 counts of theft and official misconduct pertaining to ATP cards 901-226-720, 901-030-187, 901-708-732, 901-506-118, 901-225-182, 901-508-095, 901-508-096, 901-508-097, 901-708-729, and 901-708-731.

Judgment vacated in part; affirmed in part; remanded for resentencing as to both defendants.

GOLDBERG, P. J., and O'CONNOR, J., concur.