THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MORTON EINSTEIN, Defendant-Appellant.
First District (5th Division)    No. 80-1985

Opinion filed May 7, 1982.

Ira A. Moltz, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Gregory J. Ellis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant, a pharmacist, was charged in a 152-count indictment with forgery and theft in submitting false prescriptions to the Department of Public Aid. After a bench trial, he was convicted and sentenced to concurrent terms of 3 years and 4 months to 10 years on each of 142 counts of forgery and 10 of theft. On appeal, defendant contends that (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court erred in allowing the State to call a nonpracticing pharmacist as an expert witness; and (3) he was improperly sentenced.

Richard Abrams, president of Farns Associates, Inc. (Farns), a bookkeeping and financing company for major medical professions, testified that defendant did business with his company as Fullerton Kedzie Health Clinic (Pharmacy); that Farns advanced or lent money to defendant against prescriptions which defendant brought him in connection with welfare recipients; that when defendant came in with prescriptions, Farns would prepare a voucher describing the amount an account received, the service charge, and the amount of the next check payable to defendant; that Farns would then submit the prescription forms and all necessary papers to the Department of Public Aid for reimbursement; and that Farns did this type of work for many doctors, dentists, and pharmacists. Abrams identified microfilm copies of 71 prescriptions submitted to his company by defendant and checks, vouchers, and State warrants received by his company showing payment by the State on those accounts.

An assistant director of records with the State Comptroller's Office testified that her office issues all warrants as payments for the vouchers submitted, and she identified the name of defendant on the vouchers and warrants in question.

A supervisor of the Medicare Vouchering Unit of the Department of Public Aid testified that a public aid recipient receives a green card as a means of identification and, when seeking medical services, he takes the card to a physician; that if a prescription is necessary, the physician completes a portion of a two-page prescription form (215 form) which the recipient then takes to a pharmacist who provides the prescribed drug,

signs and dates the form, and completes other portions labeled order number, item number, quantity, name of manufacturer, charge and credit; that the first page of the form is retained as a record by the pharmacist, and the second is the billing device submitted to the Department for payment. He also testified that a manual sent to providers states that a pharmacist may receive prescriptions over the telephone from a physician and may sign a physician's name with the physician's consent.

John Bertulis, a special agent for the Illinois Department of Law Enforcement, was called by the State as an expert witness. He stated that he graduated in 1973 with a bachelor of science degree from the University of Illinois College of Pharmacy and is a licensed pharmacist; that he worked in pharmacies during the summers while in school and, under the supervision of a registered pharmacist, prepared "tens of thousands" of prescriptions; that he worked for two years after graduation as a pharmacist; and that, in his current job, he uses his expertise to act as a consultant to the Department in pharmacy and doctor investigation.

Defense counsel at that point was permitted to cross-examine the witness as to his qualifications, and it was brought out that he did not have a master of science or a Ph.D. in pharmacology; that he did not take any post-graduate courses, and did not belong to any pharmacology organization; and that the last time he acted as a registered pharmacist was in 1975.

Over the objection of defense counsel, Bertulis testified as to the medicinal purposes of particular drugs on the prescription forms in evidence and that the drugs prescribed for certain recipients would not have been prescribed by physicians because they were inappropriate for the medical problem of the patient.

An employee at the Kedzie and Diversey Currency Exchange, after identifying a signature card which defendant had filled out at the currency exchange, testified that she cashed business checks for him from Farns; that she recognized his signature because she had seen him write it three or four hundred times; and that defendant's signature was on the back of checks shown to her.

A former document examiner with the Chicago Police Department testified as an expert witness over the objection of defense counsel that the known writing samples of defendant matched his signature on the Public Aid Department 215 forms in evidence.

Nathanael Burgos testified that as a high school student from 1974 to 1976, he was employed part-time by defendant at the Pharmacy; that beginning December 1974, defendant gave him blank 215 forms as well as two to three original prescriptions and asked him to copy the case identification number, the patient's first and last name, address, doctor's

American Medical Association (AMA) number from the original to the blank forms, to make two check marks for refills, and to sign the doctor's signature, and defendant then wrote in the item numbers, quantity, charge, and price; that he (Burgos) wrote out about three to four hundred forms each month; that he specifically remembered having copied the names Nilda Nieves and Linda Quintanna; and that he once saw defendant give another employee approximately 40 blank 215 forms and three to four originals. Burgos also identified his handwriting and that of defendant on the forms admitted into evidence.

Doctor Guziec testified that he had a patient named Brenda Lindsey in January 1975 whom he surgically treated for trauma to her nose; that Lindsey had also seen Dr. Dominguez-Gross for treatment; that he prescribed a medicine known as Rondomycin and post-operatively prescribed Tylenol #3; that he never authorized any prescriptions for her after January 20; and, when asked about drugs listed on eight prescription forms dated February 8 and March 19, 1975, which had the name "Gross Gizie [*sic*]" on them, he stated that he rarely and in some cases never in his career had prescribed those drugs. He identified certain exhibits as prescriptions with the name "Gross Gizie [*sic*]" on them but testified that he was totally unfamiliar with those prescriptions. On cross-examination, he stated that he often spoke with pharmacists on the telephone and did not have an independent recollection of when he treated Lindsey.

Dr. Dominguez-Gross testified that she treated Brenda Lindsey, called Dr. Guziec for authorization to prescribe Tylenol #3, and signed the prescription "Dr. Gross/Guziec."

Brenda Lindsey testified that she began receiving public aid in 1974; that Dr. Guziec performed surgery on her nose; that she was given a prescription by Dr. Dominguez-Gross, who treated her when Dr. Guziec was unavailable, which she filled at the Pharmacy; that she lost her green card in 1976; and that she never received the other prescriptions in evidence with her name on them.

Wilma Salley stated that she was a public aid recipient in 1974 and 1975; that she used her green card and went to the Pharmacy on one occasion to have a prescription filled and could not identify the 10 other prescriptions in evidence with her name on them.

Two pediatricians testified that they never prescribed certain medicines written on the prescriptions in evidence because they were not applicable to their field, and that they never signed nor authorized the prescriptions with their names on them. One of the doctors further testified that although he did prescribe certain medicine for Imelina Quintanna in 1973, he never prescribed medication for the child's mother, Linda Quintanna, who was named on 11 of the prescriptions at issue. The State similarly elicited testimony from three other physicians to the effect

that prescriptions in evidence bearing their names were not signed, written, or authorized by them.

Linda Quintanna, Theresa Styck, Angela Carmona and Nilda Nieves testified in substance that they were public aid recipients and that they had never received prescriptions shown to them in court. Nieves further stated that she had moved and lived at addresses different than those listed on the prescriptions with her name on them, and that after she moved she no longer went to the Pharmacy.

An employee of the AMA explained that all physicians in the United States have a personal medical education number and that certain AMA numbers listed on the prescriptions in evidence for particular physicians were either incorrect or nonexistent.

Dr. Gavrilovich, whose deceased father was also a doctor, stated that neither he nor his father prescribed certain drugs listed on prescriptions in evidence dated December 1974 and March 1975 which contained their names; that his father died in September 1974 and, prior thereto, had an office above defendant's pharmacy for at least 12 years; that he believed defendant had a direct line to his father's office; and that he helped his father out in the office, although he did not practice there.

The defense called an agent of the Illinois Division of Criminal Investigation who testified that Brenda Lindsey and Wilma Salley told him that they had never had any prescriptions filled at the Pharmacy. A registered pharmacist then testified that he filled approximately 100,000 public aid prescriptions in 1974 and 1975; that nothing on the 215 form indicates whether the recipient presenting the green card is the person named on the card; and that there is no relation between the AMA number on the 215 form and acceptance of the form by the Department of Public Aid.

OPINION

Defendant first contends that his guilt was not proved beyond a reasonable doubt. He argues that the State's evidence was exclusively circumstantial and failed to show the existence of a crime or that he was guilty of any wrongdoing.

Initially, we note that defendant was found guilty beyond a reasonable doubt of 142 counts of forgery and 10 counts of theft. Seventy-one convictions for forgery were based on section 17—3(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 17—3(a)(1)) and the other 71 convictions were based on section 17—3(a)(2) (Ill. Rev. Stat. 1973, ch. 38, par. 17—3(a)(2)). Those sections provide:

"§17—3. Forgery.) (a) A person commits forgery when, with intent to defraud, he knowingly:

(1) Makes or alters any document apparently capable of de-

frauding another in such manner that it purports to have been made by another or at another time, or with different provisions, or by authority of one who did not give such authority; or

(2) Issues or delivers such document knowing it to have been thus made or altered; or

* * * ."

Five of the theft convictions were based on section 16—1(a)(1) of the Code (Ill. Rev. Stat. 1973, ch. 38, par. 16—1(a)(1)) and five on section 16—1(b)(1) (Ill. Rev. Stat. 1973, ch. 38, par. 16—1(b)(1)). Those sections provide:

"§16—1. Theft.) A person commits theft when he knowingly:

(a) Obtains or exerts unauthorized control over property of the owner; or

(b) Obtains by deception control over property of the owner; or

* * *

and

(1) Intends to deprive the owner permanently of the use or benefit of the property; or

* * * ."

Circumstantial evidence is sufficient to support a conviction as long as it leads to reasonable and moral certainty that the accused committed the offense. (*People v. Larson* (1980), 82 Ill. App. 3d 129, 402 N.E.2d 732.) It is sufficient if the evidence, as a whole, satisfies the trier of fact of defendant's guilt beyond a reasonable doubt (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6), and he is not required "to search out possible explanations compatible with innocence and elevate them to the status of reasonable doubt" (*People v. Stone* (1977), 46 Ill. App. 3d 729, 731, 361 N.E.2d 330, 332). "Forgery and theft are not crimes which are committed openly and notoriously. They are by nature secretive. Therefore, it is necessary that certain elements of those crimes be proved as logical deductions from the facts in evidence." (*People v. Toellen* (1978), 66 Ill. App. 3d 967, 970-71, 384 N.E.2d 480, 483.) Further, in a bench trial, the credibility of witnesses and the weight to be given their testimony are for the trial court, and the reviewing court will not substitute its judgment unless proof is so insufficient that there appears a reasonable doubt of guilt. *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 64.

Here, all six public aid recipients whose names were on the 71 prescriptions at issue testified that they had used their "green card" on at least one occasion at the Pharmacy and were unable to identify any of the prescriptions containing their names. Nieves additionally testified that she had moved since her first visits to the Pharmacy and had different ad-

dresses than those shown on the prescriptions. All of the doctors whose signatures appeared on the 71 prescriptions stated that they had never prescribed certain drugs named on the prescriptions because the drugs were inapplicable to their field. Both Dr. Guziec and Dr. Dominguez-Gross testified that on one occasion Dr. Dominguez-Gross had prescribed medication for Brenda Lindsey with Dr. Guziec's approval, and Dr. Dominguez-Gross explained that she signed the prescription "Dr. Gross/Guziec." Neither she nor Dr. Guziec could account for additional prescriptions signed "Gross Gizie [sic]." Further, although Dr. Gavrilovich's father had been dead since September 1974, there were several prescriptions dated December 1974 and March 1975 with his signature on them. The State also elicited testimony to the effect that certain physician AMA numbers on the prescriptions were nonexistent or incorrect, and the expert pharmacist testified that certain drugs listed on the prescriptions were inappropriate for the medical condition of the recipient.

A document examiner affirmed that defendant's signature was on each of the 71 prescription forms, and a former employee of defendant explained that while working for defendant he was given hundreds of blank prescription forms and a few original prescriptions—including prescriptions for Nilda Nieves and Linda Quintanna—and was instructed to copy data from the originals and to sign the doctor's name and that defendant would then complete the remaining portions of the form.

It was also shown at trial that the prescriptions at issue had been delivered to Farns, the company which served as a conduit for payment between the State and defendant. The president of Farns further identified certain vouchers, checks and State warrants showing payment by the State on certain accounts. Specific vouchers were also identified as having been paid by the State by an employee of the State Comptroller's Office. Finally, defendant's signature was identified on the back of checks shown to an employee of a nearby currency exchange who cashed defendant's business checks from Farns and who stated that defendant had been in the exchange approximately 300 times in 1974 and 1975.

■■ After our examination of the record, we are not left with a reasonable doubt of guilt. The evidence supports findings that defendant, with intent to defraud, filled out 71 public aid prescriptions without the authorization of the named physicians, in violation of section 17—3(a)(1) of the Criminal Code, and that, through Farns, he delivered them to the Department of Public Aid, in violation of section 17—3(a)(2). It is also clear that he obtained payments from the State with the intent to permanently deprive it of those funds, in violation of sections 16—1(a)(1) and 16—1(b)(1).

Defendant also asserts that the trial court erred in permitting a nonpracticing pharmacist to testify as an expert witness in pharmacy.

■■ An expert witness is generally qualified to testify where he has knowl-

edge in a given subject area beyond that of persons of common intelligence and ordinary experience (*Sullivan v. Berardi* (1980), 80 Ill. App. 3d 417, 399 N.E.2d 708; *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528), and the knowledge required to qualify as an expert may be obtained from study, experience, or both (*Cannell v. State Farm Fire & Casualty Co.* (1975), 25 Ill. App. 3d 907, 323 N.E.2d 418). It is within the discretion of the trial court to determine whether a witness is qualified as an expert, and the decision will not be overturned on review absent a finding of clear and prejudicial error. *People v. Wade.*

In the present case, the State preliminarily established that John Bertulis was a registered, licensed pharmacist with a degree from the University of Illinois College of Pharmacy; that during his 4-year training period, while working as an apprentice pharmacist under the supervision of a registered pharmacist, he prepared tens of thousands of prescriptions; that after graduation, from 1973 to 1975, he worked as a pharmacist filling prescriptions, dispensing medications, and acting as a consultant to medical professionals; and that, while employed by the Illinois Department of Law Enforcement, he has also acted as a consultant in pharmacy investigations and taught pharmacology to other law enforcement officers.

■■ We believe that the education and experience of the witness exhibits knowledge and expertise in the field of pharmacy beyond that ordinarily shared by lay persons. Further, his testimony concerned the uses of drugs in prescriptions dated in 1974 and 1975, the years during which he was actively practicing, and this testimony was not negated by the defense. We are thus of the opinion that the trial court did not abuse its discretion in permitting Bertulis to testify as an expert.

Defendant next contends that the trial judge incorrectly convicted and sentenced him for 152 separate offenses because the multiple offenses were based on the same criminal act.

In *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, it was held that when more than one offense arises from closely related acts and are not lesser included offenses, the court may properly enter convictions with concurrent sentences.

■■ We believe it clear in the present case that the forgery offenses arose from distinct acts requiring different elements of proof. Seventy-one counts were based on fraudulently making or altering prescriptions (Ill. Rev. Stat. 1973, ch. 38, par. 17—3(a)(1)), and the remaining forgery counts relate to issuing or delivering the prescriptions knowing that they were thus made or altered (Ill. Rev. Stat. 1973, ch. 38, par. 17—3(a)(2)).

■■ Although the theft convictions arose from acts closely related but distinctly separate from the acts which form the basis for the forgery

offenses, it appears that the convictions of theft under section 16—1(b)(1) must be vacated. There were five convictions under that section and five under section 16—1(a)(1), and it was held in *People v. Fowler* (1979), 72 Ill. App. 3d 491, 390 N.E.2d 1377, that sections 16—1(a) and 16—1(b) do not undertake to create separate and distinct offenses but, rather, to create a single offense of theft which may be performed in a number of ways. (See also *People v. Marino* (1970), 44 Ill. 2d 562, 256 N.E.2d 770, where it was so held with respect to sections 16—1(a) and 16—1(d).) Thus, the five convictions under section 16—1(b)(1) will be vacated.

■■ Where there is no indication from the record that a vacated conviction had any bearing on the sentence, it is not necessary to remand the cause for resentencing. (*People v. Wilson* (1981), 93 Ill. App. 3d 395, 417 N.E.2d 146.) In the present case, the trial judge sentenced defendant separately on each of the 152 Class 3 felony convictions, and it does not appear that the five theft convictions under section 16—1(b)(1) had any bearing on the sentences on the other 147 counts. We find *People v. Walton* (1981), 94 Ill. App. 3d 903, 419 N.E.2d 495, and *People v. Guppy* (1975), 30 Ill. App. 3d 489, 333 N.E.2d 576, cited by defendant in support of remanding this cause for resentencing, inapposite as those cases involved one sentence imposed for multiple convictions. (See *People v. Worthen* (1982), 105 Ill. App. 3d 386, 434 N.E.2d 423; *People v. Carmickle* (1977), 46 Ill. App. 3d 112, 360 N.E.2d 794.) Therefore, while five theft convictions and the sentences thereon must be vacated, we consider it unnecessary to remand for resentencing and affirm the sentences on the remaining 147 counts.

Defendant also argues that he was prevented from exercising a knowing and intelligent election of whether to be sentenced under the old or current sentencing code because the trial judge incorrectly admonished him as to the possible sentences which could be imposed.

The Unified Code of Corrections provides that a defendant has the right to elect to be sentenced under the law in effect at the time of the offense or under the statute in effect on the date of sentencing. (Ill. Rev. Stat. 1979, ch. 38, par. 1008—2—4(b).) However, no statute or supreme court rule mandates that specific admonitions be given (*People v. Smith* (1979), 74 Ill. App. 3d 796, 394 N.E.2d 53), or that defendant be informed by the sentencing judge prior to election of the particular sentences which he would impose under each act (*People v. Finley* (1980), 82 Ill. App. 3d 307, 402 N.E.2d 769). All that is required of the trial judge is that he inform the accused of his right to an election (*People v. Warfel* (1979), 67 Ill. App. 3d 620, 385 N.E.2d 175), as it is the burden of counsel to explain the sentencing laws and to suggest to defendant what appears to be his best choice (*People v. Finley; People v. Warfel; People v. Gunner* (1979), 73 Ill. App. 3d 533, 392 N.E.2d 165).

■■ At the sentencing hearing, the court informed defendant that he had

the right to elect to be sentenced under either the old statute (Ill. Rev. Stat. 1973, ch. 38, pars. 1005—8—1, 1005—8—2, 1005—8—4) or under the new sentencing law (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—8—1, 1005—8—2, 1005—8—4). After informing defendant of the sentencing procedure under the old law and that the offenses for which he had been convicted were Class 3 felonies, the court explained sentencing under the new statute as follows:

"At present the Court no longer imposes indeterminate sentences. We now impose fixed or definite or determinate. For a Class III felony it would be somewhere between 2 and 5 years. However, the Court can impose what we call an extended term. If there are certain aggravating factors present the extended term would be somewhere between 5 and 10 years. And again, because there's more than one offense the sentences would be consecutive, so that again it would be up to 20 years. But it would be for a fixed number of years, such as 2 or 4 or 12 or 20."

Defendant acknowledged that he understood the court's explanations and affirmed that he had discussed the differences in statutes with his attorney and that he wished to be sentenced under the statute in effect at the time of the offense. We therefore reject the contention that defendant was incorrectly admonished concerning the possible sentences which could be imposed.

Defendant finally suggests that the trial judge abused his discretion in sentencing him to the maximum term allowable by statute. The sentencing judge is normally in the best position to make a sentencing determination based upon the particular circumstances of each case, and the imposition of a sentence is a matter of judicial discretion which will not be altered on review absent an abuse thereof. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

It is clear that defendant's sentence of 3 years and 4 months to 10 years was within the statutory sentencing guidelines for Class 3 felonies. (Ill. Rev. Stat. 1973, ch. 38, pars. 1005—8—1(b)(4), 1005—8—1(c)(4).) Further, the record shows that the judge fully considered factors in mitigation and aggravation.

At the sentencing hearing, the court commented that it was appalled that a man of defendant's education, financial condition, and standing in the community would commit such crimes and that he had used grade school and high school boys to fill out the prescription forms. The court also noted that, while there were many mitigating factors, defendant had utilized his position, his reputation, and the protection of the community to provide an easy means of committing the crimes and that it was important to deter others from doing the same.

In view of the serious and continuing nature of defendant's conduct and the magnitude of forgery and theft offenses, we do not believe that the trial court acted arbitrarily or abused its discretion in sentencing defendant to the maximum term. The fact that he is well-educated, comes from a strong religious background, and has no prior record does not mandate a reduced sentence.

For the foregoing reasons, five theft convictions under section 16—1(b)(1) and the sentences thereon are vacated, and the remaining convictions and sentences for forgery and theft are affirmed.

Affirmed in part and vacated in part.

LORENZ and WILSON, JJ., concur.