THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HARRY MARTIN *et al.,* Defendants-Appellants.

Second District   Nos. 82—105, 82—114 cons.

Opinion filed January 12, 1984.—Rehearing denied February 23, 1984.

Steven Clark, of State Appellate Defender's Office, and Alan D. Goldberg, Assistant Public Defender, both of Chicago, for appellants.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Phyllis J. Perko and Cheri A. Novak, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE VAN DEUSEN delivered the opinion of the court:
In separate informations, defendants Harry Martin and Dennis Mc-

Clinton were each charged with two counts of armed robbery, two counts of armed violence and seven counts of unlawful use of weapons. In a consolidated Jury trial on the armed robbery and armed violence counts, the defendants were each found guilty of two counts of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(a)) and two counts of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2). In the defendants' consolidated bench trial regarding the unlawful use of weapons charges, each was found guilty of two counts of unlawful use of weapons. (Ill. Rev. Stat. 1979, ch. 38, par. 24—1(a)(9).) Defendant Martin was sentenced to 35 years' imprisonment on each count of armed robbery, 35 years on each count of armed violence, and five years on each count of unlawful use of weapons. Defendant McClinton was sentenced to 30 years on each count of armed robbery, 30 years on each count of armed violence, and five years on each count of unlawful use of weapons. All sentences were to run concurrently for both defendants.

On February 18, 1981, at about 11 p.m., the defendants pushed their way through the rear door of an Oak Brook McDonald's restaurant during the course of a bread delivery. The defendants herded the employees into a corner and approached John Kasprzyk, the store manager. The defendant Martin was dressed in a snowmobile suit, wearing a ski hat and gloves and wielding a revolver. He pointed the gun at Mr. Kasprzyk's face, ordered the manager to the rear of the store, and then commanded him to open and empty the contents of the store safe into a bucket. The other employees were ordered into the walk-in refrigerator. The defendant McClinton, who was dressed in dark pants, ski cap, gloves, jacket and pinkish glasses, then took Mr. Kasprzyk at gunpoint to the front of the restaurant and directed him to empty the cash register drawers into the bucket. In addition to over $1,800, the defendants also took a white bank bag from the safe. On the bag were written the words "BACK UP."

One week later, on February 25, 1981, at approximately 11 p.m., the defendants were observed in the immediate area of a Darien McDonald's. When stopped, the officers found the two revolvers and the bank bag from McDonald's. Defendants were subsequently arrested and charged with armed violence, armed robbery and unlawful use of weapons.

On May 26, 1981, defendants filed two motions to suppress evidence. On June 8, 1981, a hearing was first held on the motion to suppress pertaining to the stop and search of the car in which Martin and McClinton were arrested.

The first witness on this motion was Harry Martin. He testified

that on February 25, 1981, he was driving in his brother's Ford station wagon with Dennis McClinton as his passenger, when they were stopped by the Darien police. According to Martin, immediately after they were stopped, the arresting police officers stood about 10 or 15 feet away with their guns drawn, and told Martin to get out of the vehicle and put his hands on his head and walk toward them. None of the police officers approached the vehicle prior to the time Martin was ordered out of the car. When he was ordered to get out of the car, Martin turned to McClinton and told the other man to get out of the vehicle, and they then walked toward the police with their hands on their heads. When they reached the squad cars, Martin testified that the police threw them to the ground, placed shotguns and pistols against their heads and backs, and then proceeded to go to the car. Martin and McClinton were both searched, and they were then told to stand up and were placed against the squad car. Martin stated that after searching the defendant's car, an officer announced that he had found a bag but had not found what the police were looking for. The officer was told by a sergeant to keep searching. Martin thereafter heard the motor of his car turn off, and then a police officer hollered that he had found something in the glove compartment. Prior to this, Martin testified that the glove compartment had been locked. After the officers had opened the glove compartment, Martin and McClinton were taken over to the car and placed inside. Martin was read his rights and was told that the defendants were going to be taken to the police station, and that they were being arrested and held under investigation for an armed robbery.

The first witness for the State on this motion to suppress evidence was Darien Police Sergeant Edward S. Musial. His version of the events occurring on February 25, 1981, was quite different from that presented by the defendants. He testified that on February 25 he was in his car with another officer when he observed a Ford station wagon on Seminole Drive just north of Plainfield Road, directly across from a McDonald's in Darien. The vehicle first passed by the squad car and then backed up in front of them. At this time, Musial said he observed that a taillight lens was cracked on defendants' vehicle, although the light was operative. Defendants' car then turned around and parked on Seminole Drive for about a minute. Officer Musial then heard the car's engine start up again, the headlights came on, and the car moved onto Plainfield Road. The officer then testified that he lost the vehicle, but "two other officers stationed in the area someplace else viewed the vehicle the whole time." Musial and his partner subsequently saw the vehicle going eastbound on a different

street. According to Musial, the defendants' car traveled directly in front of the police vehicle, pausing at a stop sign. In the light cast by the squad car headlights, Musial observed two male blacks in the interior of the passing car and noticed one was wearing a blue snowmobile suit, similar to that which one of the robbers had been wearing at the February 18 McDonald's robbery. The age of the two male blacks appeared to be the approximate age of the subjects mentioned in a police radio message regarding the previous McDonald's robbery. By the time the vehicle was actually pulled over by Officer Musial, at 10:45 or 10:50 p.m., five to 10 minutes had passed since the officer first observed the vehicle with the broken taillight lense.

Immediately after stopping the defendant's station wagon on Nantucket Street, Sergeant Musial ordered the occupants out of their vehicle. As they exited the car, the defendants were ordered away from the vehicle and directed to get on the ground. Subsequently, they were both patted down. While defendants were on the ground, Musial went up to the station wagon to check if there was anyone else hiding in the darkened vehicle. Musial testified that as he approached the vehicle, he could see on the floor a red bank bag marked with a McDonald's name, plus a blue ski mask, a blue knit cap and two pairs of gloves on the front seat. In a prior police radio message, and in a flier the officer had received concerning the Oak Brook McDonald's robbery, he had gained information that one of the robbers had worn a blue ski mask, the other had worn a blue knit cap, and they both had been wearing gloves. After finding the bag, gloves, and hat, Musial walked back to the squad car and gave his handcuffs to an officer so that one of the defendants could be handcuffed.

Musial then returned to the station wagon because he had additional information that one of the robbers had been armed with a 4-inch revolver and the other with a 2-inch revolver. According to Musial, he opened the unlocked glove compartment and found a 4-inch, .38-caliber revolver in "plain view," and a bank-type bag with the words "BACK UP" written on the bag. Inside the bank bag, he found a .32-caliber, 2-inch revolver inside a holster. Musial testified that he had looked in the glove compartment because "we were investigating two subjects in an armed robbery" and he wanted to check for weapons or other fruits of the crime.

A head security manager from McDonald's, who was present at the scene, identified the bank bag as having been taken from a McDonald's store in an armed robbery. Musial then advised the other officers that he believed that these were the two men who were wanted for investigation in an armed robbery. The two men were read their

*Miranda* warnings and taken into custody.

Following the testimony of Martin and Musial, the trial court denied the defendants' motion to suppress and made the following finding:

> "That the stopping of the vehicle based on the articulable suspicion was reasonable and the vehicle having been stopped and the observations of the police officer who testified as to what he saw in the vehicle, justified a further intrusion into the vehicle that is, the glove compartment."

A hearing was then held on a second motion to suppress. In this motion defendants requested the suppression of identification testimony on the grounds that the defendants had been illegally detained without being presented to a magistrate, and that during this period of illegal detention a counselless lineup was conducted. Both Martin and McClinton testified that initially they were denied an opportunity to call a lawyer at the Darien police station. Martin stated that he was told that he did not need to call an attorney because he was only being held for investigation. Martin and McClinton were held in the station house basement for approximately an hour, and then were taken upstairs to be photographed and fingerprinted. Afterwards, each defendant was permitted to make a phone call. Martin telephoned his fiancee and told her to contact his lawyer and inform the attorney of his location and predicament. McClinton called his mother.

Subsequently, the defendants were transported to the Oak Brook police station. They each testified that they were denied their requests to make another phone call from the second station house. Sometime during the morning of February 26, defendants were put in several separate lineups. There was no attorney present at any of the lineups, although Martin testified he requested his lawyer's presence. At the lineups, McClinton was identified by three of five witnesses, while Martin was identified by one witness.

After the lineups, McClinton was served with a complaint for armed robbery and an arrest warrant with a bond of $100,000. Martin received a copy of a charge for armed robbery and unlawful use of weapons, as well as a warrant from Chicago. Each defendant was also given a ticket for driving without a license and for having an inoperable taillight. On the morning of February 27, both defendants were taken before a judge.

The trial court denied defendants' motion to suppress the identification testimony and the case proceeded to a jury trial on counts I, II, III and IV charging armed robbery and armed violence. The defendants waived their right to a jury on counts VI and VII charging un-

lawful use of weapons on February 18, 1981 (date of robbery). Counts VIII through XII charging unlawful use of weapons on February 25, 1981 (date of arrest) were initially severed and later *nolle prossed*. Count V, charging unlawful use of weapons on February 18, was also *nolle prossed*.

At trial, the State produced a number of eyewitnesses to the February 18 robbery. Their testimony included identification of the defendants, identification of the items worn by defendants during the crime, and identification of the revolvers used by defendants.

During the presentation of witnesses, the defense renewed a prior motion *in limine* to restrict the State from bringing out the fact that defendants were arrested in the vicinity of the Darien McDonalds. The court denied the motion again. The attorneys for each defendant also renewed the motion to suppress the fruits of the search of the car. The motion to suppress was again denied.

Defendants have appealed both their convictions and sentences, and they allege a score of pretrial, trial and post-trial errors. We first consider, however, the State's preliminary challenge of defendants' standing to raise a constitutional fourth amendment claim. Under the general principles of *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421, the State asserts that because defendants drove a borrowed automobile they had no "reasonable expectations of privacy" in the vehicle and consequently they cannot contest the halt and search of that automobile. Evidence at the trial court indicates that the car driven by defendant Martin was not owned by either himself or McClinton, but that the defendants did have the owner's permission to use the car.

■ While the State may raise some issue as to the rights of persons who borrow another's automobile to challenge police searches of that vehicle, that is not the relevant issue in this appeal. As the defendants correctly point out, the search of their car is only being attacked as a fruit of the illegal police conduct in *seizing* the defendants. No standing problem exists where a defendant claims that the evidence sought to be suppressed was obtained as a result of an illegal seizure of that defendant. (*People v. Reynolds* (1981), 101 Ill. App. 3d 576, *aff'd* (1983), 94 Ill. 2d 160; *People v. Bradi* (1982), 107 Ill. App. 3d 594, 597-98.) Since the defendants do have standing to challenge the detention of their vehicle, they may rightfully contest whether the police conduct involved was legal.

Defendants first substantive contention on appeal is that the forceful actions of the police in making the stop of defendants' automobile amounted to an arrest, requiring probable cause. Alternatively,

they argue that even if characterized as "investigatory stop" under *Terry,* the halt of defendants' vehicle was not based on the requisite reasonable suspicion. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) In light of the exact language used by the trial court in its ruling on defendants' motion to suppress, the relevant issue can be narrowed to whether the arresting officers' actions met the requirements of a *Terry* investigatory stop.

It should be remembered that the "stop and frisk" rule of *Terry* involves a two-part procedure. First, the police officer must have a reasonable, articulable suspicion of criminal activity to justify a detention; and second, the "frisk" of the person detained must be both based on a reasonable fear that defendant is armed, and limited to a pat-down search for weapons. In total, the permissible intrusion of an investigatory detention is governed by a balancing of the societal need to detect crime and insure police safety against the severity of intrusion into a citizen's privacy. (*People v. Smithers* (1980), 83 Ill. 2d 430, 437-38.) These concerns are not only important to a constitutional analysis of a "stop and frisk" but also for a statutory review of such a detention. The Code of Criminal Procedure of 1963, sections 107—14 and 108—1.01, essentially codifies the same concerns articulated in the Federal constitutional cases. Ill. Rev. Stat. 1981, ch. 38, pars. 107—14, 108—1.01; *People v. Lee* (1971), 48 Ill. 2d 272, 279; *People v. McGowan* (1977), 69 Ill. 2d 73, 77.

The defendants in the instant case contest the legality of both their initial detention and the subsequent frisk by police officers. As to the stop of defendants, the requisite degree of suspicion which will constitutionally justify such a detention was originally set forth in the *Terry* case: "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880.) While *Terry* involved an on-the-street encounter, the stopping of a motor vehicle and detention of its occupants falls within the scope of the same rule. See *People v. Drummer* (1980), 81 Ill. App. 3d 626; *People v. Kantowski* (1983), 98 Ill. 2d 75; *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330.

While there is a wealth of authority on investigatory stops, including the numerous cases cited by the defendants, the various facts of those cases make each distinguishable. As in all cases involving a search and seizure, the reasonableness of the police conduct in the present case depends upon its particular facts and attendant circum-

stances. (*People v. Smithers* (1980), 83 Ill. 2d 430, 435; *People v. Mills* (1983), 115 Ill. App. 3d 809, 812.) In the present controversy, the factual justification for the police officer's detention of defendants is based in large part upon defendants' close resemblance to a circulated, composite physical description of the suspected robbers. This description detailed the race, age, size and clothing of the suspects, including mention of the rather distinctive snowsuit garb worn by one of the robbers. While the height and weight of the defendants would be difficult to ascertain from merely viewing the suspects while they sat in an automobile, the arresting officer testified at trial that he had ample opportunity to closely observe the other elements of the defendants' appearance. The propriety of a particular detention for investigatory purposes is obviously heightened when a defendants' appearance is similar to an accurate description of a suspected criminal. (*People v. Jones* (1981), 102 Ill. App. 3d 238 (defendant's uniquely patterned turtle neck sweater, his race, and age served as basis for officers' stop of defendant); *People v. Hall* (1980), 90 Ill. App. 3d 1073, *cert. denied* (1981), 454 U.S. 893, 70 L. Ed. 2d 207, 102 S. Ct. 388 (defendants' height, race, and apparel, as well as their location, held sufficient for investigatory stop).) In addition, the defendants' vehicle was parked outside a McDonald's restaurant at the same approximate time as the previous robbery of the Oak Brook McDonald's. Since the method used in the robbery was to gain entrance when a certain delivery was made, the location and time of defendants' position was a highly relevant factor. *People v. McGowan* (1977), 69 Ill. 2d 73, 78-79 (defendant and companion wearing dark clothes spotted late at night walking in a high crime area).

Taken together, and in light of the detaining officers' experience, the evidence adduced at trial was sufficient to lead a man of reasonable caution to believe that the detention of the defendants was appropriate. (*Terry v. Ohio* (1968), 392 U.S. 1, 30, 20 L. Ed. 2d 889, 911, 88 S. Ct. 1868, 1884; *People v. Grice* (1980), 87 Ill. App. 3d 718, 722, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) The burden of proof that a search and seizure in a public place was unlawful is on the person seeking to challenge the seizure or suppress evidence (87 Ill. App. 3d 718, 722, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714; *People v. Beacham* (1980), 87 Ill. App. 3d 457, 464), and a finding by the trial court that a particular detention was reasonable will not be disturbed on review unless manifestly erroneous. (*People v. Conner* (1979), 78 Ill. 2d 525, 532; *People v. Grice* (1980), 87 Ill. App. 3d 718, 722, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) Defendants have

failed to sustain their burden in the instant case.

In addition to challenging their initial detention, defendants also contest the forceful nature of the alleged investigatory stop. From their perspective, the detention and frisk by the officers exceeded what was "minimally necessary to learn whether the men were armed and to disarm them." (*Terry v. Ohio* (1968), 392 U.S. 1, 30, 20 L. Ed. 2d 889, 911, 88 S. Ct. 1868, 1884.) The evidence produced at trial is somewhat controverted, but it can fairly be stated that immediately upon the stopping of defendants' car, McClinton and Martin were ordered to exit the vehicle. The officers had their guns drawn, and ordered the defendants to the ground where they were patted-down for weapons.

Once again, the intrusiveness of the police officers' actions must be reviewed in light of the countervailing public interests in detecting crime and protecting law enforcement personnel. Considering the highly dangerous nature of the suspected criminal activity and the officers' knowledge that the persons sought were armed, the conduct of the police in the present case was not unreasonable. The fact that the officers halted defendants with guns drawn and conducted a pat-down search without preliminary questioning does not necessarily convert an investigatory stop into an arrest. (*People v. Roberts* (1981), 96 Ill. App. 3d 930, 933-34; see *Adams v. Williams* (1972), 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921; *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637.)

> "During the period of the investigation, the person's freedom of movement is restricted. He is no more free to leave than if he were placed under a full arrest. The difference between an arrest and a stop lies not in the initial restraint on movement, but rather in the length of time the person may be detained and the scope of investigation which may follow the initial encounter. \*\*\*
>
> It would be anomalous to grant an officer authority to detain pursuant to an investigatory stop and yet deny him the use of force necessary to effectuate that detention." *People v. Roberts* (1981), 96 Ill. App. 3d 930, 933-34; see also *People v. Polk* (1981), 95 Ill. App. 3d 875; *People v. Sanford* (1976), 34 Ill. App. 3d 990.

■ The officers in the immediate case acted reasonably in treating defendants with a high degree of caution even prior to initiating questioning. The police action in drawing their guns, ordering the defendants out of their vehicle, and then conducting an immediate pat-down search of the defendants on the ground is an intrusion which is outweighed by the great threat posed by suspected felons.

See *People v. Zielinski* (1980), 91 Ill. App. 3d 519, 521; *People v. Gunderson* (1978), 66 Ill. App. 3d 516, 523.

Since the defendants' detention was lawful, it follows that Officer Musial was rightfully in a position where he could observe the interior of defendants' vehicle; consequently, the McDonald's money bag he saw was properly visible within the plain view doctrine. (*Texas v. Brown* (1983), 460 U.S. 730, 75 L. Ed. 2d 502, 103 S. Ct. 1535; *People v. Davis* (1981), 93 Ill. App. 3d 217; *People v. Carroll* (1973), 12 Ill. App. 3d 869, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1144, 94 S. Ct. 3180.) Peering into a halted vehicle for the purpose of insuring police safety from potential hidden suspects does not rise to the level of a "search" within the meaning of the Federal Constitution's fourth amendment. (See *People v. Brandys* (1973), 15 Ill. App. 3d 379; *People v. Piper* (1981), 101 Ill. App. 3d 296.) Illinois cases have interpreted the word "search" to imply prying into hidden places for concealed materials, not merely observing what is open to view. (*People v. Piper* (1981), 101 Ill. App. 3d 296, 299, citing *City of Decatur v. Kushmer* (1969), 43 Ill. 2d 334, 338.) An investigatory stop does not become unreasonable because the officers take precautionary measures which do not further invade the privacy interest of the defendants. A protective investigation beyond defendant's person may be justified when there is the possibility that other persons, not detained, present a danger to the investigating officers. See 3 W. LaFave, Search and Seizure sec. 9.4, at 134-37 (1978).

■ When Officer Musial observed the McDonald's bag on the seat of defendants' vehicle, he could reasonably infer that the occupants of the vehicle were connected to the restaurant burglary. This evidence, discovered in plain view, was sufficient to escalate the officer's suspicions to the level of probable cause to arrest. *People v. Drummer* (1980), 81 Ill. App. 3d 626, 629; *People v. Cribbs* (1972), 8 Ill. App. 3d 750, 753.

■ The ensuing search of defendants' automobile, including the opening of the closed glove compartment, is not directly contested by the defendants. While the propriety of this extensive search was questioned at the trial court level, the defendants on appeal challenge the search only as a fruit of the allegedly illegal initial stop. Even assuming that the issue had been raised in this appeal, the search of the defendants' vehicle would nonetheless be justified under either the expansive search-incident-to-lawful-arrest doctrine espoused in *New York v. Belton* (1981), 453 U.S. 454, 69 L. Ed. 768, 101 S. Ct. 2860, or under the warrantless-automobile-search doctrine authorized by *United States v. Ross* (1982), 456 U.S. 798, 72 L. Ed. 2d 572, 102 S. Ct.

2157.

Defendants next argue that the police intentionally delayed filing charges against them in order to hold counselless lineups. This delay, defendants contend, constitutes a violation of their rights under the fourth and fourteenth amendments to the United States Constitution and section 7 of article I of the Illinois Constitution of 1970, and also amounts to a breach of their statutory right (Ill. Rev. Stat. 1981, ch. 38, par. 109—1) to a prompt, probable cause determination. The record discloses that the defendants were held in custody approximately 36 hours before being taken to court for a probable cause determination. Their initial arrest occurred at about 11 p.m. on February 25, 1981. The following day, a number of counselless lineups were held and identifications were made. After the lineups, defendants were served with formal charges. On the morning of February 27, defendants were brought to daily bond court before a judge.

As the State correctly suggests, a delay of a day, or a day and a half, is unlikely to be an unreasonable detention. (See *People v. Dees* (1981), 85 Ill. 2d 233; *People v. Kirkley* (1978), 60 Ill. App. 3d 746; *People v. Jackson* (1961), 23 Ill. 2d 274.) The determination of what is an unnecessary or unreasonable delay depends upon the facts and circumstances of each case. (23 Ill. 2d 274, 278.) Some latitude is allowed, and presentment to a judge need be performed only with that reasonable promptness which circumstances permit (see *People v. Georgev* (1967), 38 Ill. 2d 165; *People v. Kelly* (1949), 404 Ill. 281; *People v. Mallett* (1970), 45 Ill. 2d 388). A lineup held for investigatory purposes, prior to preliminary hearing, does not necessarily indicate law enforcement abuse. For example, in the *Kelly* case, the defendant was arrested about 9 p.m. on Saturday night and was thereafter identified in a police lineup by two of the victims. It was not until the following Tuesday that he was taken before a magistrate. The Illinois Supreme Court rejected the defendant's claim that there was unreasonable delay in taking him before a judge in view of the circumstances that the police investigation was not completed until Monday morning. (See also *People v. Bryant* (1982), 105 Ill. App. 3d 285.) As the United States Supreme Court noted in *Gerstein v. Pugh* (1975), 420 U.S. 103, 114, 43 L. Ed. 2d 54, 65, 95 S. Ct. 854, 863, it is the serious consequences arising from prolonged detention which necessitated its holding that the fourth amendment requires a judicial determination of probable cause as a prerequisite to *extended restraint of liberty following arrest.* In the instant case, no such prolonged detention or extended restraint of liberty occurred prior to the taking of defendants before a judge. The defendants were arrested late at night

on February 25 and taken before daily bond court approximately 24 hours after the commencement of the next business day. Such a minimal delay was reasonable considering the time necessary to perform the administrative steps incident to arrest. *Contra, Bernard v. City of Palo Alto* (9th Cir. 1983), 699 F.2d 1023.

■ Moreover, the defendants have not clearly established that any prejudice resulted from their minimal delay before a preliminary hearing. (*People v. Dees* (1981), 85 Ill. 2d 233, 238.) Defendants made no incriminating statements during the delay, nor have they shown that the lineups conducted were unnecessarily suggestive and conducive to irreparable mistaken identification. A short delay in presentment before a judge cannot be a basis for reversal absent a showing of undue prejudice. 85 Ill. 2d 233, 238.

Defendants further contend that since they requested that retained counsel be present at lineups held prior to their preliminary hearing, the conducting of such lineups without honoring that request violated their rights to counsel and to due process under the fifth and sixth amendments of the United States Constitution, article I, sections 2 and 8 of the Illinois Constitution of 1970, and section 103—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 103—3). We find no merit to this argument.

■ Since the identification lineups of February 26, were prior to the defendants' preliminary hearing, no judicial adversarial stage warranting the right to counsel had yet arisen. (See *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877; *People v. Agee* (1981), 100 Ill. App. 3d 878; *People v. Williams* (1980), 90 Ill. App. 3d 524, *cert. denied* (1981), 452 U.S. 943, 69 L.Ed. 2d 958, 101 S. Ct. 3090; *People v. Johnson* (1973), 55 Ill. 2d 62.) Defendants' reliance upon cases from southern jurisdictions, where the right to counsel has been expanded to include other additional police-defendant contacts, is misplaced since Illinois has not adopted that expansive approach. (*People v. Harrell* (1982), 104 Ill. App. 3d 138, 142.) In our State, a warrantless arrest based on probable cause simply does not initiate such adversary judicial proceedings as would give rise to a right to counsel at a lineup conducted prior to the preliminary hearing. *People v. Agee* (1981), 100 Ill. App. 3d 878, 881-82; *People v. Williams* (1980), 90 Ill. App. 3d 524, 529, *cert. denied* (1981), 452 U.S. 943, 69 L. Ed. 2d 958, 101 S. Ct. 3090; *People v. Shorter* (1978), 59 Ill. App. 3d 468, 476.

Defendants have likewise failed to show that the pretrial identification procedures were so unnecessarily suggestive and conducive to mistaken identification as to deny them due process. *Neil v. Biggers*

(1972), 409 U.S. 188, 197, 34 L. Ed. 2d 401, 410, 93 S. Ct. 375, 381; *People v. Williams* (1980), 90 Ill. App. 3d 524, 528, *cert. denied* (1981), 452 U.S. 943, 69 L. Ed. 2d 958, 101 S. Ct. 3090; *People v. Owens* (1977), 46 Ill. App. 3d 978, 990; see *People v. Bryant* (1983), 94 Ill. 2d 514, 520-21.

The defendants also assert that they were denied their statutory right to communicate with an attorney of their choice. (Ill. Rev. Stat. 1981, ch. 38, par. 103—3.) There is some factual dispute regarding this matter, but assuming *arguendo* that such a statutory violation occurred, it would not be a basis for reversing defendants' conviction or setting aside the witness identifications in this case. As has already been stated, defendants did not have a right to counsel at the lineup prior to their preliminary hearing. Further, there were no statements or confessions that came from the accused during their detention. While section 103—3 of the Code of Criminal Procedure of 1963 does provide arrestees with the right to contact their attorneys, failure to abide by this provision does not necessarily mandate a vacation of conviction or suppression of identification. (Ill. Rev. Stat. 1981, ch. 38, par. 103—3; *People v. Ishman* (1969), 44 Ill. 2d 61.) Section 103—3 is not a *per se* rule of exclusion or reversal, and absent the substantive right to counsel, the making of incriminating statements in custodial interrogation, or evidence of abuse of police procedures, a defendants' conviction will not be reversed because of a violation of this section.

In addition, while the right to communicate with counsel may rise to the level of a violation of constitutional due process when the denial of such right interferes with the ability of the defendant or his counsel to prepare for or defend at trial (see *City of Chicago v. Harmon* (1969), 117 Ill. App. 2d 361, 365), we discern no such constitutional violation under the facts of this case. In the present case, each defendant was allowed to make a phone call, and although defendants argue that they were prevented from communicating with their retained counsel, the record does not reflect that defendants, either separately or cooperatively, ever did actually retain their own counsel. To the contrary, the record reflects that the court *appointed* counsel to represent each defendant, and the appointments were made sufficiently in advance of the preliminary hearings so that no claim is made that defendants' counsel did not have adequate time or opportunity to properly prepare for the hearing or the subsequent trial.

Defendants' next argument on appeal is that they were prejudiced by the introduction of evidence which suggested other criminal conduct. Before trial, the lower court held a hearing on a motion *in*

*limine* regarding the introduction of the fact that defendants were arrested in the vicinity of a second McDonald's restaurant. While not making any precise ruling at that time, the trial judge said that if the prosecutor referred to the circumstances attending defendants' arrest, she should be ready to introduce supporting evidence. The assistant State's Attorney did not mention the location of the arrest in her opening statement.

Subsequently, however, on cross-examination of Officer Musial, defense counsel inquired whether the officer had observed defendants commit a crime during the time of surveillance. On the State's objection that this question was leading into the total circumstances of the arrest, defense counsel withdrew the question. Upon further examination by both parties, the trial judge apparently concluded that defense counsel had opened the door as to all matters surrounding defendants' arrest. He explained, "I believe now the door has been opened so far as this officer can let the jury know what information he was armed with when he made the stop." He then permitted the prosecutor a limited number of additional inquiries involving the location of defendants' stop.

Defendants argue that evidence of their location at a second McDonald's was unduly prejudicial because it suggested that defendants were committing a second crime. (*People v. Miller* (1977), 55 Ill. App. 3d 421.) The *Miller* court stated the general rule that evidence of other crimes cannot be admitted to show motive, identity, or intent until it is shown that those other crimes actually took place and that defendant participated in their commission. (55 Ill. App. 3d 421, 426.) Consequently, defense counsel argues that the defendants' presence at the second McDonald's was not a crime in itself and therefore could not be properly introduced. Moreover, the defendants argue that their location at the time of the arrest was irrelevant to the issue of their guilt of the February 18 robbery; defendants' location at the second McDonald's was relevant only as to the reasons for Officer Musial's stop of defendants on February 25 and that matter was resolved at the pretrial suppression hearing.

■ The trial court, however, concluded that defense counsel's questioning had planted in the minds of the jury uncertainties as to why Officer Musial took special note of the two defendants on February 25. He permitted limited introduction of evidence of defendants' presence at the second McDonald's, not to establish defendants' propensity to commit crime, but as relevant circumstantial evidence pertaining to the February 18 robbery. Mention of the second McDonald's restaurant was an integral part of the narrative of the defendants' ar-

rest, involving relevant evidence of time, proximity and defendants' identity. (*People v. Walls* (1965), 33 Ill. 2d 394, 397-98; *People v. Spiezio* (1982), 105 Ill. App. 3d 769, 772-73; *People v. Davis* (1981), 93 Ill. App. 3d 187, 191; *People v. Schubert* (1975), 28 Ill. App. 3d 599.) The facts and circumstances attending an arrest of an accused may be put into evidence when they tend to connect defendant with the offense for which he is being tried. (See *People v. Evans* (1962), 25 Ill. 2d 194, *cert. denied* (1963), 372 U.S. 922, 9 L. Ed. 2d 727, 83 S. Ct. 738; *People v. Schubert* (1975), 28 Ill. App. 3d 599.) Testimony involving the location of defendants' arrest was carefully limited, and no prejudicial or inflammatory language was used. The trial court did not err in permitting the admission of such evidence.

The next issue raised on appeal is whether defendant Dennis McClinton was properly found guilty of two related counts of unlawful use of weapons. Under the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, pars. 24—1(a)(9), 24—1(b)), the guilty defendant must be armed with a revolver and masked in such a manner as to conceal his identity. Under these charges, whether defendant McClinton was masked in such a manner as to conceal his identity was an essential element of the offense which the State necessarily had to prove beyond a reasonable doubt. See *People v. Smith* (1978), 71 Ill. 2d 95, 105; *People v. Rothermel* (1982), 88 Ill. 2d 541, 544.

According to the testimony adduced at trial, McClinton wore a type of tinted pink or peach glasses and a ski hat during the perpetration of the crime. Eyewitness Jerry Kinzey testified as to McClinton's apparel, stating that he could see through the pink glasses worn by the defendant although they were dark. He added that about three-quarters of an inch was open between the defendant's hat and the dark glasses. Upon further questioning, Kinzey stated that the glasses did not hide or distort defendant's features. Eyewitness Judith Wordel testified that the glasses were wire-framed, pink or peach tinted aviator-type glasses. She stated that the glasses were not sunglasses, but they did have a little bit of shade to them. The glasses did not interfere with her view of the subject.

■■ While generally it is the jury's responsibility to make the factual determinations such as this one (*People v. Davis* (1983), 95 Ill. 2d 1, 27; *People v. Smith* (1978), 71 Ill. 2d 95, 102), a fair reading of the evidence falls far short of establishing that defendant McClinton was masked in such a manner as to conceal his identity. We therefore conclude that the State failed to prove beyond a reasonable doubt that Dennis McClinton was masked.

The State attempts to rebut defendant's position by claiming that

even if McClinton were not masked within the meaning of the statute, he can be found guilty under alternative theories encompassed in the unlawful-use-of-weapons statute (Ill. Rev. Stat. 1981, ch. 38, par. 24—1). However, the alternative subsections of section 24—1 which the State attempts to raise were *nolle prossed* by the State prior to trial. The Illinois Supreme Court has made it clear that the mere citation of the statute allegedly violated is insufficient to incorporate by reference, the whole statute into the charge. (*People v. Pujoue* (1975), 61 Ill. 2d 335.) Also, where a defendant is charged with a violation of a statute which contains disparate and alternative methods of committing an offense, the charging instrument must detail which alternative the defendant is accused of committing. (*People v. Heard* (1970), 47 Ill. 2d 501, 504-05; see *People v. Hall* (1982), 96 Ill. 2d 315, 323-24.) We conclude that the State failed to prove an essential element of the offense of unlawful use of weapons beyond a reasonable doubt, and therefore, as to the defendant McClinton the convictions and sentences for unlawful use of weapons are reversed.

Defendants next argue that since each defendant was convicted of two counts of armed robbery and two counts of armed violence, and all counts arose from the same single act committed during the robbery, only one count of armed violence can stand and the other three counts must be vacated. The same contention is made, now relevant only to the defendant Martin, that both counts of unlawful use of weapons also arise from a single act, and one count of that offense should be vacated. Further, defendants urge that if these numerous counts, on which judgments were entered and sentences imposed, are vacated on appeal, the causes should be remanded for new sentencing on the convictions which remain.

The State concedes the correctness of defendants' contention on this matter, except that it argues that there is no indication that the trial court considered duplicative counts when sentencing, and thus remand for resentencing is not necessary.

We agree with both parties that under the doctrine of *People v. King* (1977), 66 Ill. 2d 551, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, the two counts of armed robbery and the two counts of armed violence can result in only one conviction and sentence for each defendant. However, since armed robbery and armed violence are both Class X felonies and of equal seriousness, it would appear that the conviction and sentence could stand on either offense. (*People v. Simmons* (1982), 93 Ill. 2d 94, 98; *People v. Mormon* (1982), 92 Ill. 2d 268, 270.) Although there is some judicial expression that the conviction for armed robbery is the more specific

and the more serious offense, and therefore it should stand while the armed violence conviction and sentence should be vacated (*People v. Velleff* (1981), 94 Ill. App. 3d 820, 825-26), other decisions express deference to the prosecutorial discretion granted to the State. (See *People v. Rayford* (1982), 104 Ill. App. 3d 124.) In this case, since both crimes are Class X felonies and the State and the defendants agree that the armed-violence conviction should stand, we shall abide by their choice.

We have already set aside the convictions and sentences for unlawful use of weapons with regard to the defendant McClinton, and applying again the doctrines of the *King* case, we also conclude that one conviction and sentence for unlawful use of weapons imposed on the defendant Martin must be vacated.

We do not, however, agree with defendant's conclusion that in view of the number of convictions and sentences being vacated it is necessary to remand the case for resentencing. Defendant argues that the existence of the counts which we are vacating may have affected the judge's determination of the length of all the concurrent sentences imposed, including the sentences for the convictions of armed violence and unlawful use of weapons which we are affirming; therefore, defendant concludes that even those sentences must be vacated and the cause remanded for resentencing as to those convictions.

Although there is some precedent which suggests that resentencing is appropriate whenever a trial court's sentence determination *might* have been influenced by a vacated conviction (*People v. Vallero* (1978), 61 Ill. App. 3d 413, 415-16; *People v. Bone* (1982), 103 Ill. App. 3d 1066, 1069; *People v. Alejos* (1982), 104 Ill. App. 3d 414, 416, *aff'd* (1983), 97 Ill. 2d 502), the genesis of that case line reveals an inapposite origin. (See *People v. Einstein* (1982), 106 Ill. App. 3d 526, 535.) The above cases which find resentencing appropriate rely upon authority expressly limited to the context of a defendant convicted of multiple offenses but receiving a single sentence for all of the convictions. (See *People v. Guppy* (1975), 30 Ill. App. 3d 489; *People v. Walton* (1981), 94 Ill. App. 3d 903; *People v. Ross* (1978), 60 Ill. App. 3d 857.) Obviously, in that context, resentencing was imperative when one of the convictions was vacated; however, the same conclusion does not follow when a defendant has properly received separate sentences for each conviction.

A reviewing tribunal cannot conclude, *solely* from a trial court's simultaneous imposition of separate sentences for multiple convictions, that the sentence imposed for one offense has been influ-

enced by the conviction or sentence for another offense. Sentencing is a trial court function (*People v. Cox* (1980), 82 Ill. 2d 268, 280; *People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93), and unless the record demonstrates to the contrary, we will conclude that the court considered only the appropriate factors in making its sentencing determinations. Since there is no evidence in the record suggesting that defendants' remaining sentences were improperly affected by their separate additional convictions and sentences, we will not remand their remaining convictions for resentencing. *People v. Owens* (1982), 109 Ill. App. 3d 1150, 1160; *People v. Einstein* (1982), 106 Ill. App. 3d 526, 535; *People v. Worthen* (1982), 105 Ill. App. 3d 386, 392; *People v. Wilson* (1981), 93 Ill. App. 3d 395, 397.

■■■ Defendants make the final claim that the trial court improperly ruled that they were eligible for extended-term sentences under section 5—5—3.2(b)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(1)). This section provides that under certain conditions, an extended term may be imposed upon a defendant who has previously been convicted of any felony of the same or a greater class within 10 years. While each defendant admits that he has previously been convicted of armed robbery, each contends that the provisions of the statute in question apply only when the previous conviction arose in the situation where the defendant was separately brought and tried. They argue that a defendant who is convicted after a guilty plea has not been "tried." Two districts of this court recently addressed this identical contention. (See *People v. Way* (1983), 115 Ill. App. 3d 198; *People v. Baker* (1983), 114 Ill. App. 3d 803.) The result of both cases was to uphold the extended-term sentence where the prior conviction was based on a guilty plea. The court in *Way* explained the purpose of section 5—5—3.2(b)(1):

> "This provision *** prevents a court from imposing an extended term upon a defendant based upon charges tried concurrently. The language in question thereby ensures that a prior conviction, when used as the basis for an extended term, will be totally separate and distinct from the charges for which the extended sentence is imposed, so that it is clear that the accused is in fact a recidivist." (*People v. Way* (1983), 115 Ill. App. 3d 198, 202.)

Under the rationale of the *Way* and *Baker* decisions, defendants' position on their sentencing hearings has no merit.

Consistent with the holdings and conclusions of this opinion, we reverse, in trial court number 81 CF 325 of the Eighteenth Judicial Circuit, defendant Harry Martin's judgments of conviction and sen-

tences for armed robbery in counts I and II, for armed violence in count III, and for unlawful use of weapons in count VI; we affirm the judgments of conviction and sentences of Harry Martin for armed violence in count IV and for unlawful use of weapons in count VII.

In trial court number 81 CF 326 of the Eighteenth Judicial Circuit, we reverse the judgments of conviction and sentences of Dennis McClinton for armed robbery in counts I and II, for armed violence in count III and for unlawful use of weapons in counts III and VII; we affirm the judgment of conviction and sentence of Dennis McClinton for armed violence in count IV.

Affirmed in part and reversed in part.

SEIDENFELD, P.J., and LINDBERG, J., concur.