THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD ROBINSON, Defendant-Appellant.

First District (1st Division)   No. 85—2968

Opinion filed November 9, 1987.

Steven Clark and Karen Michaels, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Christopher J. Cummings, and Lynda A. Peters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Ronald Robinson, was convicted of the offense of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2) and was sentenced to 30 years' imprisonment. Prior to trial, the court had held that there had been no reasonable grounds for defendant's warrantless arrest and suppressed the victim's lineup identification of defendant and statements which defendant had made in the squad car and following the lineup as fruits of the illegal arrest. On appeal, defendant contends that: (1) the trial court erred in denying his motion to dismiss the indictment on the grounds that, contrary to section 109—3.1 of the Code of Criminal Procedure of 1963 (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 109—3.1), defendant had not been indicted within 30 days following his arrest; (2) the trial court erred in not suppressing a camera bag and its contents taken from defendant's girlfriend at the time of defendant's arrest; (3) the trial court erred in finding that the victim's in-court identification of defendant had an independent origin and was admissible; and (4) the trial court failed to give adequate consideration to defendant's rehabilitative potential when it sentenced defendant to the maximum term of 30 years for armed robbery. For the following reasons, we affirm the judgment of the trial court.

The record sets forth the following facts which are relevant to this appeal. On October 21, 1984, approximately 12:30 a.m., Joe Amos was waiting for a bus inside the CTA passenger terminal located at 2410 W. Congress Parkway when he was robbed at gunpoint by two black males. The assailants took Amos' money, as well as his camera bag, which contained two 35-millimeter cameras and miscellaneous camera equipment. After the assailants left, Amos took the next bus home and immediately called the police. When an officer arrived at his home, Amos gave him a description of his assailants and of the stolen cameras and equipment.

The following evening, approximately 8:55 p.m., Chicago police officer Kenneth McNeil and two plainclothes officers assigned to foot patrol at the Rockwell Garden Housing Project saw defendant and a female walking down the sidewalk. The female was carrying a camera bag over her shoulder. The officers stopped the couple and asked them where they had been. Defendant told McNeil that they had just left his girlfriend's house. While McNeil took defendant over to the squad car to run a name check on him, the other officers looked through the female's shoulder bag, which contained camera equipment and two cameras. When asked about the contents of the bag, defendant told them he had found the bag in a trash can.

The officers then took defendant to police headquarters to check whether any report had been filed on missing cameras and camera equipment. When they discovered that a report had been filed, defendant was arrested. Detective James Antonacci of the Chicago police department then contacted Amos at his home and asked him to come to police headquarters to view the property which had been taken from defendant's girlfriend. Amos identified the cameras and equipment as that which had been taken from him the day before. He then identified defendant in a lineup as one of his assailants.

Prior to trial, the parties stipulated that if defendant were called to testify, he would state that on October 22, 1984, approximately 8:55 p.m., he was stopped by the police at 2517 W. Adams without legal process and evidence had been seized which the State intended to use in its prosecution. A hearing was then held on defendant's motion to suppress the lineup identification, any statements made by defendant, and the cameras and camera equipment on the ground that they were tainted by the illegal arrest. Following arguments on the motion, the trial court ruled that the officers' unjustified stop of defendant was not "constitutionally permissible" and granted defendant's motion to quash his arrest. The trial court then suppressed defendant's explanation about his possession of the camera bag and its contents, Amos' lineup identification of defendant, and defendant's statement made after the lineup. The court further ruled that the stop of defendant was distinct from the stop of his girlfriend and, thus, the seizure of the camera bag from the girlfriend was not tainted by defendant's illegal arrest.

Thereafter, defendant personally presented to the court his handwritten motion to dismiss the indictments. When queried as to whether he had discussed the motion with his attorney, defendant replied that he had and his attorney did not agree that it should be presented. The motion was brought pursuant to section 109—3.1 of the Code, which requires that a person either receive a preliminary examination or a grand jury indictment within 30 days from the date he was taken into custody (the 30-day rule). The court denied the motion on the grounds that the situation fit within the exception to the 30-day rule set forth in section 109—3.1(b)(2) which states that the 30-day rule does not apply if defendant is eventually indicted by the grand jury for the offense for which he had been initially taken into custody. There was no argument by either side on the motion.

Following jury selection and opening statements, Joe Amos testified as to the events surrounding the armed robbery. Amos stated that the bus terminal was brightly lit by fluorescent lighting, so that

he could clearly see defendant's face. Amos estimated that he saw defendant's face for approximately 15 minutes. Later that morning, Amos described his assailant to a police officer as a black male with a light complexion, 18 to 20 years old, 118 pounds and 5 feet 8 inches tall. At trial, Amos identified defendant as his assailant.

Following completion of the State's case, the trial court denied defendant's motion for a directed verdict. The defense then rested its case and closing arguments ensued. Thereafter, the jury found defendant guilty of armed robbery and the court entered judgment on the verdict. Subsequently, defendant moved for a judgment notwithstanding the verdict, or in the alternative, a new trial, alleging that: (1) the trial court erred in failing to suppress the camera bag evidence; (2) the trial court erred in allowing the admissibility of Amos' in-court identification of defendant; (3) the verdict was not supported by the evidence; (4) defendant had been prejudiced by the State's closing argument; and (5) the trial court erred in denying defendant's motion for a directed verdict. The trial court denied the post-trial motion.

Subsequently, at the sentencing hearing, Salvador Miranda testified on behalf of the State that on October 13, 1984, approximately 4:30 a.m., he had been robbed at gunpoint while he was waiting on the CTA platform at 500 S. Western. Miranda identified defendant as the person who had pointed the gun at him and had taken his jewelry. At police headquarters on October 23, 1984, Miranda identified as his some jewelry taken from defendant on the day of his arrest for the Amos robbery.

Next, Rene Robinson, defendant's sister, testified that when the police showed her the jewelry taken from defendant at the time of his arrest, she had identified one of the medallions as her own. Rene's testimony was later contradicted by Detective Angelo Rinchiuso, who testified on behalf of the State that when he showed the medallion to Rene, she had said that it did not belong to her. Instead, she thought that it belonged to defendant's girlfriend. Following a review of the events surrounding the offense as well as defendant's background, the trial court sentenced defendant to 30 years in prison. Defendant's timely appeal followed.

Defendant first contends that the trial court erred when it denied his motion to dismiss the indictment, which motion was predicated on the fact that he had not been indicted within 30 days following his arrest in violation of the 30-day rule set forth in section 109—3.1(b) of the Code.

Section 109—3.1(b) provides:

"(b) Every person in custody in this State for the alleged

commission of a felony shall receive either a preliminary examination *** or an indictment by Grand Jury ***, within 30 days from the date he or she was taken into custody." (Ill. Rev. Stat. 1985, ch. 38, par. 109—3.1(b).)

The section sets forth six exceptions to the 30-day rule. The relevant exception to the present case states:

"(2) when the defendant has been indicted by the Grand Jury on the felony offense for which he or she was initially taken into custody." Ill. Rev. Stat. 1985, ch. 38, par. 109—3.1(b)(2).

In the present case, defendant was arrested on October 22, 1984, and indicted by the grand jury on November 15, 1984, 24 days after he was taken into custody. The indictment was subsequently filed on November 27, 1984, and an arraignment followed on December 5, 1984. Defendant claims that he did not know about the indictment until his arraignment. However, defendant did not file his motion to dismiss the indictment until trial was scheduled to commence on September 9, 1985, 276 days after the arraignment. Relying on exception (2) to the 30-day rule, the trial court denied defendant's motion on the ground that he was eventually indicted on the felony offense for which he had been arrested. While we concur with the trial court's denial of defendant's motion to dismiss the indictment, we disagree with the court's rationale.

First, with respect to the exception to the 30-day rule relied upon by the trial court, we agree with defendant that the trial court's interpretation of the exception is contrary to the intent of the statute, which is to protect against unjustified detention. To accept the trial court's interpretation that the 30-day rule does not apply as long as an accused is eventually indicted for the offense for which he was arrested would permit the prosecution to take an indefinite time to indict an accused following his arrest. In our view, the more logical interpretation of the exception set forth in subsection (2) is that as long as an accused is indicted within 30 days for the offense for which he was originally arrested, he may be indicted for a separate offense beyond the 30-day period. Pursuant to this interpretation, the detention would be justified by the timely indictment for the original offense. In the present case, defendant was arrested and indicted within 30 days for a single offense. Thus, the exception to the 30-day rule is not relevant.

Defendant argues that because he did not become aware of the indictment until his arraignment on December 5, 1984, he did not "receive" the indictment within 30 days of his arrest pursuant to section 109—3.1(b). Defendant claims that "only when that indictment is filed

of record and an arraignment has been conducted does the accused in any sense 'receive' the indictment." Defendant further contends that his interpretation of the word "receive" gives effect to the true intent of the legislature derived from the "ordinary and popularly understood meanings" of the words of section 109—3.1(b). We disagree.

■ If the legislature intended that an accused must be "arraigned" within 30 days of his arrest, it would have set forth that requirement. Instead, the legislature stated that an accused must receive an indictment within that period. It is undisputed that defendant was indicted 24 days after his arrest. At that point, his detention was justified. We do not find defendant's contention that he did not learn of his indictment until the arraignment persuasive grounds for reversal. It is well established that one of the purposes of arraignment is to inform the accused of the formal written accusation against him in a formal manner. (*People v. Johnson* (1966), 34 Ill. 2d 202, 215 N.E.2d 204.) Although we do not condone withholding indictment information from an accused who has been arrested, neither do we condone an accused's failure to inquire as to the indictment and his subsequent reliance on his inaction as grounds for reversing a conviction.

Next, defendant contends that the trial court erred in not suppressing the camera bag and its contents as fruits of his unlawful arrest. Defendant argues that because the camera bag was taken from his girlfriend after he had been illegally detained, the bag should have been suppressed. In response to the State's argument that defendant's fourth amendment rights were not violated because the bag was taken from a third party, defendant claims that he had a legitimate expectation of privacy in the bag which provided grounds for his fourth amendment claim.

■ Initially, we note that any reliance on the doctrine of standing by either party with respect to the right to raise fourth amendment claims is inappropriate. In *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421, the United States Supreme Court held that because fourth amendment rights are personal, the issue of standing is subsumed in the question of whether a person's fourth amendment rights have been violated. Further, the *Rakas* court held that the capacity to claim protection of the fourth amendment depends upon whether a person has a legitimate expectation of privacy in the invaded place. (439 U.S. at 143, 58 L. Ed. 2d at 401, 99 S. Ct. at 430.) Subsequently, in *Rawlings v. Kentucky* (1980), 448 U.S. 98, 65 L. Ed. 2d 633, 100 S. Ct. 2556, and *United States v. Salvucci* (1980), 448 U.S. 83, 65 L. Ed. 2d 619, 100 S. Ct. 2547, the Supreme Court

applied *Rakas*, adding that while property ownership is a consideration in the determination of whether an individual's fourth amendment rights have been violated, it is "neither the beginning nor the end of this Court's inquiry." *Rawlings*, 448 U.S. at 91, 65 L. Ed. 2d at 628, 100 S. Ct. at 2553.

In *Rawlings*, six police officers, armed with an arrest warrant for Lawrence Marquess, arrived at Marquess' house. In the house at the time was a roommate and four visitors. While police searched the house unsuccessfully for Marquess, they smelled marijuana and discovered marijuana seeds. As a result, two of the officers left to obtain a search warrant. While the two officers were gone, the other officers detained the occupants, allowing them to leave only if they consented to a body search. Two of the occupants were searched and left. The others remained. When the officers returned with the search warrant, one of the officers ordered Cox, an occupant, to empty her purse onto a table. When she did so, 1,800 tablets of LSD and vials of other controlled substances spilled out. When Cox told Rawlings to take what belonged to him, Rawlings claimed ownership of the controlled substances that had been recovered. Rawlings moved to suppress the drugs, the money, and statements made by him as fruits of an illegal detention and illegal search. The motion was denied.

The Supreme Court held that Rawlings had not sustained his burden of proving that he had a legitimate expectation of privacy in Cox' purse so as to allow him to challenge the validity of the search of the purse. Further, the fact that Rawlings had claimed ownership of the drugs did not entitle him to challenge the search. In reaching its decision, the Supreme Court noted that: (1) Rawlings had known Cox for only a short time; (2) Rawlings had never previously had access to Cox' purse; (3) Rawlings had no right to exclude others from access to Cox' purse; (4) "the precipitous nature of the transaction hardly supports a reasonable inference that petitioner took normal precautions to maintain his privacy" (448 U.S. at 105, 65 L. Ed. 2d at 642, 100 S. Ct. at 2561); and (5) Rawlings admitted that he had had no subjective expectation that Cox' purse would be free from governmental intrusion. 448 U.S. at 105, 65 L. Ed. 2d at 642, 100 S. Ct. at 2561.

■ In the present case, as in *Rawlings*, the facts do not indicate that defendant had a legitimate expectation of privacy in the camera bag. Defendant is correct in his assertion that the *Rawlings* court relied upon some facts which are not present in our circumstances. However, our facts suggest even less of an expectation of privacy than in *Rawlings*. For example, in *Rawlings*, defendant attempted to

conceal the drugs in a closed purse, which suggests an effort to maintain privacy. By contrast, in our case, defendant gave the camera bag and its contents, which he had stolen from Amos, to his girlfriend to carry without any attempt to conceal it. As in *Rawlings*, we do not find that the "precipitous nature of the transaction" supports a reasonable inference that defendant had any expectations of privacy in the bag or its contents.

Further, we find the cases relied upon by defendant to be factually distinguishable and of no persuasive value to the present case: *People v. Kunath* (1981), 99 Ill. App. 3d 201, 425 N.E.2d 486 (court declined to address the issue of the search and addressed only the issue of the legality of the stop); *People v. LaGrone* (1984), 124 Ill. App. 3d 301, 464 N.E.2d 712 (legality of the stop at issue); *People v. Reynolds* (1981), 101 Ill. App. 3d 576, 428 N.E.2d 694 (appellants specifically did not claim a privacy right in the property of a third person); *People v. Martin* (1984), 121 Ill. App. 3d 196, 459 N.E.2d 279 (stop and frisk). Moreover, *People v. Myles* (1978), 62 Ill. App. 3d 931, 279 N.E.2d 897, and *People v. White* (1978), 56 Ill. App. 3d 757, 372 N.E.2d 691, have been superceded by *Rakas* and its progeny, which have placed the focus in fourth amendment inquiries on whether defendant had a legitimate expectation of privacy in the area invaded. Accordingly, we conclude that defendant did not establish a legitimate expectation of privacy in the camera bag and its contents, which were carried by his girlfriend, so as to allow him to challenge the validity of its search.

Next, defendant contends that Amos' in-court identification of him did not have an origin independent of his illegal arrest and, therefore, was inadmissible.

■ In *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, the Supreme Court enumerated several factors to be considered in determining whether an in-court identification has an origin independent from illegal police conduct (the independent origin test): (1) the prior opportunity to observe the alleged criminal act; (2) the existence of any discrepancy between any prelineup description and the defendant's actual description; (3) any identification prior to lineup of another person; (4) the identification by picture of the defendant prior to the lineup; (5) the failure to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the lineup identification.

Defendant contends that Amos' in-court identification did not have an independent origin that would remove the taint of the suppressed lineup identification because Amos' initial description of the

offender was too vague and he did not have ample opportunity to view the offender at the scene of the crime. Further, defendant argues that pursuant to *United States v. Crews* (1980), 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244, when out-of-court identifications are determined to be fruits of illegal police conduct, an evidentiary hearing must be held. No evidentiary hearing was held in this case.

■ The facts of the present case do not support defendant's contentions that Amos' initial description was too vague and that he did not have ample opportunity to view defendant. The record indicates that Amos described his assailant by sex, race, height, weight and complexion. In *Crews*, the Supreme Court found a similar description sufficient to satisfy the prior identification factor of the independent origin test. Similarly, in *People v. Dangerfield* (1979), 78 Ill. App. 3d 1046, 398 N.E.2d 57, the court found that the victim's identification of her assailant by race, age, height, weight, facial hair and clothing was sufficiently detailed.

Defendant further claims that Amos did not have ample opportunity to view defendant during the incident because Amos was too distracted by his own fear. This conclusion is also not supported by the record. Amos testified that he had had a face-to-face confrontation with defendant for approximately 15 minutes in a brightly lit area. Amos' statement that every time he saw the defendant after the incident, he pictured the rifle, does not mean that his attention had been riveted solely on the rifle during the incident, as defendant would have us believe. That statement simply refers to the effect that defendant's appearance has on Amos. In other words, defendant and the rifle are inseparable in Amos' mind. Further, the fact that Amos was afraid during the incident does not undermine the validity of his identification. If that were the case, every victim's identification based on face-to-face confrontation with his assailant during the incident would be suppressed.

The application of our facts to the independent origin test is very similar to the application made in *United States v. Crews*, in which the Supreme Court found that the independent origin test had been satisfied. In *Crews*, three women had been robbed and assaulted at separate times within a three-day period by a young black male in the washroom on the grounds of the Washington Monument. Defendant was detained and taken into custody under the auspices of a truancy violation and a photograph of him was then taken. Subsequently, this photo was identified by two of the victims. Based on the photo identification, defendant was again taken into custody and identified by the two victims in a lineup. Defendant's arrest was found to have been

made without probable cause, and, as a result, the photo identification and the lineup identification were suppressed. However, the in-court identification was found to be admissible, having been based upon an independent origin that was untainted by intervening identifications. In affirming the admissibility of the in-court identification, the Supreme Court attached "particular significance" to the following factors: "the victim viewed her assailant at close range for a period of 5-10 minutes under excellent lighting conditions and with no distractions [gun not considered to have been a distraction], [citation]; respondent closely matched the description given by the victim immediately after the robbery [citation]; the victim failed to identify anyone other than respondent [citation], but twice selected respondent without hesitation in nonsuggestive pretrial identification procedures [citation]; and only a week had passed between the victim's initial observation of respondent and her first identification of him." *United States v. Crews*, 445 U.S. at 474 n.18, 63 L. Ed. 2d at 547 n.18, 100 S. Ct. 1251 n.18.

Application of our facts to the independent origin test yields the same result as in *Crews*. The only differences in our facts to those in *Crews* are that Amos had a longer period of observation during the incident and less time passed between the incident and the initial lineup identification. Accordingly, pursuant to *Crews*, we find that the trial court properly admitted the in-court identification.

■ Moreover, defendant's suggestion that the matter should be remanded because there was no evidentiary hearing on the issue of the in-court identification is not supported by the facts or the law. First, the trial court agreed to an evidentiary hearing and even scheduled a time. However, for some reason, the hearing was never held and jury selection commenced. Defendant did not object at the time. In our opinion, he cannot now raise as an issue on appeal an alleged error he apparently allowed to take place without objection. Further, contrary to defendant's position, *United States v. Crews* does not mandate that an evidentiary hearing be held in these circumstances.

Defendant next claims that the trial court failed to give adequate consideration to his rehabilitative potential when he sentenced him to the maximum term of 30 years for armed robbery. Specifically, defendant argues that the trial court: (1) imposed a sentence that is disproportionate to the nature of the offense; (2) completely ignored the rehabilitative factors set forth in the presentence report; (3) failed to consider the constitutionally mandated objective of restoring the offender to useful citizenship; and (4) was improperly motivated by vengeance in imposing such a severe sentence. The State responds

that defendant's sentence was within the statutory guidelines of 6 to 30 years' imprisonment for a Class X felony (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3)), such as armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2). Further, the State contends that the sentence was based upon defendant's potential for violence demonstrated by his prior criminal activity.

■ It is well settled in Illinois law that the imposition of a sentence is a matter of judicial discretion which will not be altered absent evidence of an abuse of this discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Penalties are to be determined according to the "seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11. See also *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 364 N.E.2d 491.

In the present case, in making its sentencing determination, the trial court considered the following factors: (1) threat of death or bodily harm; (2) well-planned and executed robbery at gunpoint; (3) defendant's 1980 conviction for rape; (4) offense was committed within four months of defendant's parole for the rape conviction; and (5) credible evidence that during that four-month period, defendant also committed a similar armed robbery on another victim. Further, the court stated:

> "He does have family. He does have children. But I think considering all of the facts, that the statute requires that I consider and I think a sentence—a significant sentence is called for by this particular offender for this offense."

The court also noted that although defendant qualified for an extended-term sentence of up to 60 years, it would impose only a 30-year sentence.

■ Defendant raises several specific allegations of error with respect to the sentence. First, defendant claims that the trial court put undue emphasis on the fact that the crime occurred on a CTA platform, a factor that is not statutorily mandated for consideration. Although it is true that the court specifically noted that the robbery occurred while the victim was waiting for public transportation, the record does not support defendant's claim of undue emphasis. It was merely a factor that comprised the surrounding circumstances of the crime. As stated by our supreme court in *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, "A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case."

■ Second, defendant contends that the identification of him by an alleged second victim, who had been robbed under similar circum-

stances, was not believable. It is axiomatic that the trial judge is in the best position to determine the credibility of a witness, and the reviewing court should not substitute its judgment for that of the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Accordingly, because there is no evidence to support defendant's bare allegation, we defer to the trial court's judgment.

Third, defendant argues that the trial court incorrectly applied the statutory aggravating factor which refers to the threat of serious harm when it considered the offense itself as an aggravating factor. In support of his position, defendant relies on *People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906, and *People v. Rhodes* (1986), 141 Ill. App. 3d 362, 490 N.E.2d 169. In both *Conover* and *Rhodes*, the courts held that a factor implicit in a crime cannot be used as an aggravating factor at sentencing. However, in the present case, defendant does not contend that the court used an element of the armed robbery offense. Rather, he contends that the court erroneously considered the offense itself. It is difficult to imagine how a court could impose a sentence for a particular offense and not consider the offense itself. The trial court merely considered the circumstances of the offense, which included the threat of harm. In our view, defendant is attempting to support an illogical argument with inapplicable case law.

Fourth, defendant argues that the trial court "completely failed to utilize the factors in mitigation in determining the sentence." Again, the record does not support the contention. The court specifically noted defendant's family and children. In addition, as stated in *People v. Baker* (1983), 114 Ill. App. 3d 803, 448 N.E.2d 631, it is not necessary that a trial court articulate factors in mitigation that it has considered. Rather, when the trial court articulates factors in aggravation, it is presumed that the court balanced those factors against factors in mitigation.

Fifth, defendant contends that the trial court did not give sufficient weight to defendant's rehabilitation potential when he sentenced him to 30 years. Illinois' constitutional mandate required that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11.) This court has held that not only must the court consider the rehabilitative factor, but it must also act on it as an objective of its sentence. *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 364 N.E.2d 491.

In the present case, the court did not expressly articulate a consideration of defendant's rehabilitative potential. However, the

court's stated objective in imposing the sentence implies that rehabilitation had been consciously considered:

"You'll be 40 years old when you get out of the *** penitentiary, Mr. Robinson, and by that time, your potential for violence will be minimum."

Apparently, the court concluded that based upon defendant's background, his rehabilitative potential was minimal. It has been held by this court that "a defendant's potential for rehabilitation may be so minimal that it need not be reflected in the sentence actually imposed." *People v. Shumate* (1981), 94 Ill. App. 3d 478, 485, 419 N.E.2d 36.

Finally, defendant argues that the court was motivated by vengeance when it sentenced him to a term of 30 years. This allegation is belied by the fact that the court declined to impose an extended-term sentence although it was statutorily authorized to do so.

Based upon the aforementioned, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

BUCKLEY and O'CONNOR, JJ., concur.